## ARNOLD v. ADAMS et al.

No. 19805. Opinion Filed Dec. 16, 1930.

Stanley D. Campbell, for plaintiff in error.

W. P. Neison, for defendants in error Brooker, Powell, Warren, and Carmichael.

John G. Ellinghausen, for defendant in error Emmett Adams.

DIFFENDAFFER, C. This is an action brought originally by R. R. Kirchner and the Champlin Refining Company against all the parties involved in this appeal, to foreclose lien against an oil and gas lease, etc. Judgment was rendered for the amount claimed and foreclosing the lien. From this part of the judgment, no appeal is prosecuted.

Plaintiff in error will be referred to as

Arnold. Defendant in error Adams, as Adams; and defendants in error Brooker, Powell, Warren, and Carmichael as Brooker et al.

The controversy arose over the drilling of a well for oil and gas on the land belonging to Adams. It appears that Adams is the owner of 80 acres in Creek county. On March 25, 1926, Arnold and Adams entered into a written agreement whereby Adams agreed to secure for Arnold oil and gas leases, or assignment of oil and gas leases, on some 320 acres of land, including the 80 acres owned by Adams. The leases and assignments were to be placed in the bank in escrow, and Arnold agreed that:

"If he takes the said leases and assignments from escrow in the said bank, that he will drill or cause to be drilled a test well located on the E. 2 of the N. W. 4 of sec. 2-17-10, said well to be drilled with due diligence to the horizon of the Wilcox sand, unless said well is a commercial producer of oil or gas at lesser depth, in which case all obligations of second party under this contract shall be considered fulfilled; second party further agrees that in case the Red Fork sand shows when drilled as a possible producer, that it shall be tested and shot."

At the same time they entered into a second agreement, to which a copy of the first was attached, in which Adams was designated as first party, and Arnold as second party, which provided:

"Second party agrees that provided the drilling contract, a copy of which is attached hereto, executed by and between the parties hereto as of this date, is consummated, then second party shall assign to first party an undivided one-fourth interest to the lease covering the E. 2 of the N. W. 4 of sec. 2, Twp. 17 N. R. 10 E., Creek county, Okla., and that second party shall drill and complete the said well at his own expense into the tanks if the said well is a producer; the said one-fourth interest of first party to bear its proper proportion of the operating expense of the lease after the said well is connected to the tanks and producing oil or gas; should the said well be a dry hole, then all material and equipment used in the drilling of same shall remain the property of second party."

The leases and assignments, or a substantial part thereof, apparently satisfactory to Arnold, were secured by Adams and placed in the bank. Thereafter Arnold and Brooker et al. entered into a written agreement, in which Arnold was designated as first party and Brooker et al. as second parties, the material parts of which are:

"First party will furnish rig, pipe, fuel, and water for the drilling of said well.

"Second parties will furnish tools and will perform the necessary labor to drill and complete the said well; said well to be drilled to the horizon of the Wilcox sand, found at the depth of approximately 3,000 feet, unless it is a producing well at lesser depth. Second parties to furnish said necessary tools and labor, and to receive in full compensation therefor, an assignment of lease covering one of the 40—acre tracts offsetting said well, as described above, and an assignment of an undivided one-fourth interest in the 80-acre lease covering the tract on which said well is to be drilled, namely, the E. 2 of the N. W. 4 of sec. 2, twp. 17 N. R. 10E., said assignments to be delivered to second parties when said well is spudded, labor as specified, includes running pipes. * * *

"If said well is dry, each respective interest shall bear its proper proportion of the cost of pulling pipe and plugging same; said cost to be at the rate of $40 per day plus casing crew."

Arnold also entered into an agreement with one Ireland, whereby he agreed to give Ireland a ⅛ interest in the well and 80-acre lease to furnish the gas for drilling the well. Ireland appears to have furnished the gas and after receiving his assignment of the ⅛ interest assigned same to Adams.

Brooker et al. commenced drilling the well sometime about July, 1926, and drilled same to near the Red Fork sand about October 30th. Adams appears to have done a great deal of work in and about the well, such as digging slush pits, making roads, hauling pipe, etc., and also bought and paid for certain 12" and 10" casing that was used in the well, and also bought and paid for certain material which he claims Arnold should have furnished, and paid certain labor bills which he also claims Arnold should have paid. It is out of this work and labor, casing material, etc., as well as pumping the well for several months, that the controversy between Adams and Arnold arose.

The Red Fork sand was found at about 1993 feet, and the well was "shot" at little below that depth. Brooker et al. put in some 14 days time in cleaning out the well, and thereafter it was "shot" a second time, and Brooker et al. put in about 39 days cleaning out after the second shot before the tubing was run and the well put on the pump. Considerable oil, however, was produced by natural flow and swabbing after the well was drilled into the sand and before it was put on the pump. It is out of this "clean out time" and the furnishing of certain material, supplies, etc., that the principal controversy between Arnold and Brooker et al. arose.

Adams claimed as against Arnold for 758

feet of ten-inch casing for the well of the value of $1,137, also a shoe for said casing of the value of $48, and for a shoe for the six-inch casing of the value of $20, and for water for the drilling of said well for a period of 39 days of the value of $5 per day, and alleged that there was due him the total sum of $1,490.50, and prayed for an accounting, etc.

Brooker et al., in their cross-petition against Arnold and Adams, after pleading their written contract with Arnold, alleged, in substance, that they had fully performed all their part of said agreement, and that upon the completion of the well Arnold and Adams orally agreed that they, Brooker et al., should proceed with the cleaning out of said well at the rate of $40 per day, and that pursuant thereto they cleaned out said well for a period of 53 days, amounting in all to $2,120; admitted that they were liable for their portion of equipment on the lease furnished by the other parties in the sum of $698.57, leaving a balance as they claimed due them of $1,066.06. They prayed for judgment against Arnold and Adams for $533.03 each, or a total of $1,066.06. They also prayed for an accounting for and on account of the oil produced from said well, of which they claimed one-fourth.

Arnold, in his answer to the cross-petition of Adams, admits the execution of the two contracts pleaded by Adams, but alleges they were not the agreements under which the drilling operations were conducted. He then pleads a long alleged contemporaneous oral agreement between himself and Adams, wherein he alleges Adams, as a part of the consideration for drilling the well, orally agreed that he would furnish rig irons, timbers, lumber, etc., from an old rig near the premises, and that during the drilling of the well, he, Adams, would assist the drillers in getting material, etc., to them; that thereafter it was found that Adams could not get the rig and material that he had agreed to furnish; whereupon, he, Adams, agreed that, in lieu of furnishing said material, he would furnish the 12-inch and 10-inch casing, as well as the shoe for the 10-inch casing, and that said oral agreement to furnish the casing was fully executed before he, Arnold, exercised his option to take the leases, etc., from the bank. He then pleads the clause in the lease contract providing for the use of water produced on the leased premises, except from wells of the lessor, in the drilling of the well, and asserts that he was therefore not liable for the water which Adams claimed for. He admits his liability for the $20 item for the 6-inch shoe and certain

material bought and paid for by Adams in the course of the drilling operations. He then pleads that after the well had been connected with the tanks, he, Arnold, had expended some $375.81, and other sums not specifically stated, for necessary equipment for the well, for which he alleges Adams is liable for his proportionate share. He then prays for an accounting as between himself and Adams, and prays judgment for such sum as may thereby be found due him from Adams. In his answer to the petition of Brooker et al., Arnold, after a general denial, admits the execution of the drilling contract between himself and Brooker et al. He then specifically denies that he agreed to pay his pro rata share of cleaning out the well at $40 per day, and asserts, in effect, that Brooker et al. were bound by their contract to furnish the tools and all labor to complete said well, and that the cleaning out was necessarily a part of the "completion" of the well. He then alleges that, under his contract with Brooker et al., he was required to furnish only such casing for the well as was necessary to produce the oil, and that Brooker et al. were to pull casing unnecessary in producing the oil and return same to him, and that by reason of the fact that he had furnished a complete string of 6⅝ inch casing, which casing was unnecessary, and that Brooker et al. had refused to pull same, they were indebted to him for its value, this being the same casing for which Kirchner et al. claimed their lien. He then prayed that, in case Kirchner et al. were given judgment against him for the value of said 6⅝ inch casing, he, Arnold, have judgment against Brooker et al. for such an amount as might be adjudged against him in favor of Kirchner et al. He further pleaded negligence on the part of Brooker et al. in drilling said well to within four or five feet of the Red Fork sand before setting the 5 3/16 inch casing, notwithstanding he had instructed them to set said string of casing 30 feet above said sand, and that as a result thereof the "shoulder" upon which said casing was set gave way and caved into the sand, etc. He then pleaded that he had expended large sums of money in equipping and operating said well after its completion for which Brooker et al. were liable as owners of an interest in the well to the extent of their interest. He then prayed for an accounting between all the parties, etc. Adams replied to Arnold's claims against him by general denial.

There were other intervening claimants not necessary to mention here.

Upon the issues thus joined the cause was

tried to the court, and resulted in a finding by the trial court to the effect that Arnold was indebted to Adams in the sum of $500 for work and labor and material furnished by Adams and rent on the string of 10-inch casing, and that said string of casing could and should be pulled and returned to Adams. And further, that Adams had furnished water for drilling said well to the value of $195, and that Arnold was liable for 5/8 of said amount, or $135; that Adams had pumped the well for 10 months, the reasonable value of such services being $600, and had furnished material to the value of $15.87, and that Arnold was liable to Adams for 5/8 of this $615.87, less a credit of $37.50, theretofore paid, or $193.44, making a total sum found owing from Arnold to Adams of $815.19, and finding that Adams owed Arnold $53.41, for his part of the cost of the second shot placed in the well, and 1/8 of the other liens, being $138.50, and that Arnold had expended $373.46 for labor and material in equipping the well, of which Adams was liable for 1/8, or $46.58, all of which should be set off against Adam's claim, leaving a total amount due Adams from Arnold of $576.70, and that Adams was entitled to an equitable lien therefor against the interest of Arnold in the oil and gas leasehold estate.

As between Arnold and Brooker et al., the court found:

"That said well was completed within the meaning of the contract on the 31st day of October, 1927, when the same was drilled to and into the Red Fork sand; that, thereafter, the defendants Brooker et al., who were the drilling contractors, cleaned out said well for a period of 51 days before the tubing and rods were run and the well placed on the pump; that there was an implied agreement under the drilling contract that said contractors should be paid day time for said cleaning out work; that the sum of $40 per day is and was a reasonable value of said services, and that the total sum of $2,120 is due and owing said contractors for said 51 days cleaning out time."

That 5/8 thereof was chargeable to Arnold, 1/4 to Brooker et al. and 1/8 to Adams.

The court further found that Arnold had expended $1,444.38 for tubing, rods, and other equipment, and for the second shot, for 1/4 of which Brooker et al. were liable; that Arnold had bought and paid $307.80 for a string of tools for which Brooker et al. were liable, making a total of $668.89, for which Arnold was entitled to credit against the $1,325, leaving a net amount due Brooker et al. from Arnold of $656.11, for which the court found Brooker et al. were entitled to an equitable lien against the interest of Arnold in the leasehold estate.

There was also a finding and judgment as between Brooker et al. and Adams, of which neither party complains. Judgment was rendered accordingly, and Arnold appeals.

Arnold presents his several assignments of error under six propositions, three being to the findings and judgment as between Arnold and Brooker et al., and three to the findings and judgment as between Arnold and Adams.

The latter three, though presented last in the briefs, we consider first, or in the order in which they appear in the journal entry of judgment.

The first proposition presented as against Adams is that, in an action for an accounting, evidence of specific items, together with testimony that there are many other items, but without proof of such other items or the amounts thereof, is insufficient to support a judgment for a greater amount than shown by the items specifically proved.

This proposition is directed to the proof of Adams relative to the amount claimed for work and labor performed and money expended by Adams for Arnold in and about the drilling of the well.

Adams testified to a number of specific items and presented receipted bills or cancelled checks for some of them, while others he testified to positively from memory. He could not remember specific items with date and amount thereof. He had kept no books, but had presented Arnold with an itemized statement which he claimed would show the items he could not remember, and called upon Arnold to produce same. Arnold admitted he had the statement, but refused to produce it. The court then permitted him to testify to the proximate total amount thereof, being $780 or $790. However, as a part of his defense to Adams' claim, Arnold produced and introduced in evidence the itemized statement, which, taken together with Adams' testimony, fully supports the finding of the court as to the amount found, to wit, $500. There is therefore no merit in this contention.

The next proposition is to the effect that the trial court erred in allowing Adams rental for the 10-inch casing in the face of Adams' pleading and claim for the value thereof. The rental value of the casing alone was shown to be but $227.40. How-

ever, Arnold contends that there is such a variance between the evidence of rental value and the pleadings that a judgment for the rental value of the casing, instead of the actual or total value, cannot be sustained. This contention cannot be upheld. Adams was permitted without objection to testify to a specific agreement with Arnold for the payment of rental for the pipe, and the rule is well established in this jurisdiction that, under such circumstances, the pleadings will be treated as amended to conform to the facts proved.

The last proposition is that the court erred in allowing Adams $5 per day for water used from his private pond on his land, built and maintained by Adams for the purpose of furnishing water for his stock. This contention, we think, is frivolous, and wholly without merit. The clause of the lease depended upon by Arnold to support this contention reads:

"Lessee shall have the right to use, free of cost, gas, oil, and water produced on said land for its operation thereon, except water from wells of lessor."

Clearly this does not mean that lessee was entitled to use water from the private pond or tank of the lessor, but means water produced by lessee by drilling wells, building tanks, or ponds, or from running streams, etc. Otherwise, under such clause, an oil and gas lessee could enter upon the premises of the lessor and use all the water impounded by lessor for private use, and thus deprive the lessor of water for his stock.

We have carefully examined the entire record, and without discussing or setting out the evidence at length, have no hesitancy in saying that the findings and judgment of the trial court as between Arnold and Adams are not against the clear weight of the evidence. On the contrary, we think they are clearly in accord therewith.

As between Arnold and Brooker et al., appellant, Arnold, directs his first proposition to the finding of the court that the well was completed within the meaning of the contract between Arnold and Brooker et al. when the same was drilled to and into the Red Fork sand, and that there was an implied agreement under said drilling contract that the contractors (Brooker et al.) should be paid for cleaning out the well, and holding Arnold liable for 'his proportionate amount of the reasonable value of said work, fixed at $2,120. It is contended that this holding is in conflict with former decisions of this court defining the term "completion

of a well." With this contention, we are inclined to agree.

In Twin States Oil Co. v. Westerly Oil Co., 93 Okla. 297, 220 Pac. 839, it was held:

"The term 'completion of well' for the purpose of operating and testing for the amount of production as used in a drilling contract, means the cleaning of the well after reaching the specified depth, so that the sand reached may give that flow of production by its own force, or by pumping, which would result from a well so prepared in the ordinary and usual manner, for making preparation for such test."

To the same effect is Uncle Sam Oil Co. v. Richards, 76 Okla. 277, 184 Pac. 575. There was involved the meaning or definition of the words "after the completion of a well," as used in the contract there involved. It was there held:

"The words 'after the completion of a well,' as used in the option contract involved herein, are words of plain meaning and significance."

—and further:

"Record examined, and held, that giving these words their ordinary meaning, the uncontradicted evidence shows that the well involved in this action was completed on the 28th day of November, 1912, after it had been successfully shot and commenced flowing oil in large quantities."

It was there contended that the well involved was completed within the meaning of the contract on October 28, 1912, when the Bartlesville sand was reached, and some oil was found which flowed, together with some water, some 70 barrels per day, just as was here found that the well was completed when the Red Fork sand was reached and some oil was produced. It was contended by the other party that the well was not completed until November 28, 1912, after the well had been successfully shot and commenced flowing oil in large quantities. Mr. Justice Kane, in the body of the opinion, said:

"It is obvious that the parties entered into the contracts hereinbefore referred to for the sole purpose of testing the leasehold involved for oil and gas. It was assumed that completing a well to the Bartlesville sand would be adequate for this purpose, and so it was. Drilling to the Bartlesville sand demonstrated at once that the leasehold contained both oil and gas, but the mere drilling to this depth did not determine whether these substances could be produced in paying quantities. * * * At this period it was impossible to say whether the well would prove to be a paying gas well, an oil well, or a dry hole. Obviously, it

was still incumbent upon the plaintiff to do something else in order to complete the well to a point where it could be determined to which of these classes the well belonged."

A contract for oil and gas development which calls for the commencement of a second well within a given time from the completion or abandonment of a first well, etc., has been construed to mean ordinarily, but not necessarily, that the time within which to commence the second well does not begin to run until it is determined that the first well is a paying producer or a failure. Taylor v. Stanley, 4 Fed. (2nd.) 279.

Brooker et al. could not assert their right to an assignment to the 40-acre offset lease until the well, if stopped in the Red Fork sand, was a producing well, or until it could be determined whether it was a producing well in that sand.

By their contract Brooker et al. agreed to furnish tools and perform the necessary labor to drill and complete said well to the horizon of the Wilcox sand found at the depth of approximately 3,000 feet, unless the well should be a producing well at a lesser depth, and as full compensation therefor were to receive an assignment of a lease covering the 40-acre tract offsetting said well, and an assignment of an undivided one-fourth interest in the lease covering the 80-acre tract upon which said well was located. In Uncle Sam Oil Co. v. Richards, supra, it was said:

"In the circumstances, no good reason appears for giving the words 'completion of a well,' or the word 'complete,' any peculiar meaning or significance. Webster's New International Dictionary defines 'completion,' the word used in the option, as follows: 'Act or process of making complete.' The same work defines the word 'completed' as follows; 'Filled up with no part, item, or element lacking; free from deficiency; entire; perfect; brought to an end; a final or intended condition; concluded; completed.' "

Brooker et al. agreed to furnish the tools and perform the necessary labor to bring the well to completion, or the state of being complete, to the horizon of the Wilcox sand. "Filled up, with no part, item or element lacking; free from deficiency; entire; perfect; brought to an end; a final or intended condition; concluded."

The only provision of the contract that would or could relieve them from this obligation was "unless it" (the well) "is a producing well at a lesser depth." In this case a producing well in the Red Fork sand. Clearly the contract means that in order to be entitled to the consideration agreed upon, they were, by their contract, required to furnish the tools and perform the necessary labor to drill and complete a producing well at a lesser depth than the Wilcox sand. In this case the Red Fork sand. Their contract meant this and could mean nothing less.

Counsel for Brooker et al., in effect, concede in their brief that the rules announced in the cases herein cited govern under the contract, except for an alleged different construction placed thereon by the parties themselves, and that, but for this alleged different construction, the contract would have required Brooker et al. to furnish the tools and perform the necessary labor to complete the well, including the cleaning out.

It is contended that during all the time the well was being drilled, and also while it was being cleaned out, all the parties placed their own construction upon the contract, which was, in effect, the accepted meaning of the term "completed well" among the vast majority of the oil operators in what is known as the Kelleyville district, in which the well is located. This Brooker et al. contend was that at the time the well was drilled into the Red Fork sand, and Arnold directed that drilling be stopped, the well was at that moment considered as completed, and thereafter the cost of all material, supplies, labor, etc., should be borne by the respective parties according to their interests in the lease.

Assuming, without deciding, that the contract could be modified in this manner, there might be some merit in this contention. If the evidence was sufficient to show that all parties had so construed the contract. But we think, from the record, the evidence does not so show. Substantially, all the evidence introduced by Brooker et al., tending in any way to show that Arnold had treated or construed the contract to mean that Brooker et al. were to be paid for their tools and labor in cleaning out the well, and that Arnold would pay his proportionate share thereof, was the evidence of Brooker and Carmichael to the effect that when it became necessary to obtain smaller tools, they went to Tulsa to see Arnold, and there informed him that they did not have the money with which to buy the tools, and that the supply house with which they were dealing did not have them, but that Hinderliter, a dealer, with whom Arnold did have an account, had the tools, and they asked Arnold to get the tools for them; that Arnold replied that he was not supposed to buy or furnish the tools; that they told him

they were not asking him to buy or furnish the tools, but that they wanted the tools to clean the well out, and that he said he would, and did, get them; that the tools were gotten on a rental basis, and that the conversation was that if the rental of the tools came anywhere near the price of them, Brooker et al. were to keep the tools, and, if not, they were to be returned. But if they kept the tools, he, Arnold, was to deduct the tools from their "cleaning out on the wells." Nothing was said as to who would pay the rental on the tools. Arnold vigorously denied this conversation. Brooker and Carmichael could not tell when this conversation was held. If this alleged conversation took place after the well had been drilled into the Red Fork sand, then Brooker et al. were there taking a position contrary to their contention here, in that they there admitted that it was their duty to furnish the tools, and if they were kept they were to pay for them. Whereas, they now assert that the moment the well reached the Red Fork sand and drilling was stopped on the order of Arnold, the well then belonged to all the parties, and each should thereafter pay his proportionate share of all expenses. In such case, it would have been the duty of Arnold to pay for his part for the tools.

If the alleged conversation took place before the well was drilled into the Red Fork sand, and the record shows that the last time the hole was reduced, or the last time it would have been necessary to use smaller tools, was about four or five feet above the Red Fork sand, then it was at a time when it was not known, and the parties had no apparent reason to know that cleaning out would be necessary. At least, this evidence shows that if the conversation was after the said sand was drilled into, Arnold was then asserting that he was not to furnish any part of the tools, and shows that he was not placing the construction upon the contract here contended for by Brooker et al.

There were a number of so-called expert witnesses who testified to an alleged custom in the Mid-Continent field, or that part thereof known as the Kelleyville field, among oil operators, to treat contracts, such as the one here under consideration, as fully performed or completed when the well had been drilled to a designated depth or sand, and the drilling was ordered stopped by the owner or one in charge for him. There was an equal or greater number of so-called experts who testified to the contrary. Those who testified to the custom as contended for by Brooker et al. practically admitted that

their testimony as to such custom was based upon contracts which called only for drilling to a certain depth, or to a certain sand, either by the foot or for an interest, without any provision for "completion" of a well.

We think the evidence wholly insufficient to show that all the parties placed a construction upon the contract different from the plain terms thereof.

Some contention is made that the contract is ambiguous and was written by Arnold himself, and should therefore be construed according to the way it was understood by Brooker et al. when they signed it, and thus give it the construction contended for by Brooker et al. In view of what was said by this court in Uncle Sam Oil Co. v. Richards, supra, it cannot be said that the contract is ambiguous.

What we have said renders it unnecessary to discuss other propositions submitted.

The judgment as between Arnold and Brooker et al. should be reversed and the cause remanded, with directions to enter judgment in accordance with the views herein expressed, and the judgment as between Arnold and Adams should be affirmed.

Appellant Arnold has filed a properly verified motion to tax the cost of preparing the case-made in the sum of $272 as costs in this appeal.

The motion appears to conform to the rules of this court, and said costs should be so taxed.

The total cost of the appeal, including the cost of making case-made, should be, and is, hereby taxed against appellant, Arnold, and defendants in error Brooker et al. equally, that is, one-half against Arnold and one-half against Brooker et al.

BENNETT, TEEHEE, HERR, HALL, EAGLETON, LEACH, and REID, Commissioners, concur.

By the Court: It is so ordered.