HOWARD *v.* HUGHES.

1. MINES AND MINERALS—OIL AND GAS LEASES—COMPLETION OF
   WELL.
   > In oil and gas lease providing that well was to be ''started
   > within 30 days of the completion of the well now being
   > drilled'' in another tract, finding of the trial judge that the
   > term ''completion'' referred to ascertainment in accordance
   > with good oil-field practice whether the well was a producer or
   > a dry hole, and not merely drilled in, is affirmed.

2. SAME—CONSTRUCTION OF OIL AND GAS LEASES.
   > An oil and gas lease should be read not only according to its
   > words, but in connection with the purpose of its clauses.

3. CONTRACTS—FORFEITURES.
   > Courts of equity do not favor forfeitures.

4. MINES AND MINERALS—COMPLETION OF AN OIL WELL.
   > In view of the nature of Michigan oil fields and the compara-
   > tively new methods of treating and acidizing wells in the
   > limestone area, an oil well may be said to have been com-
   > pleted when it has been drilled to the oil formation prevailing
   > in that district and such means have been employed to pro-
   > duce oil as are known to the industry in that community to
   > the extent that a reasonably experienced driller would use and
   > employ same in good-faith effort to make a well an oil pro-
   > ducer of a nonproducer.

5. SAME—COMMENCEMENT OF DRILLING—FORFEITURE OF LEASE—COM-
   PLETION OF WELL.
   > Under oil and gas lease providing that well was to be started
   > thereunder within a certain time of the completion of a well
   > then being drilled on another tract over which neither party
   > had control, the commencement of drilling under the lease
   > was timely when within period limited from the time it was
   > learned, in accordance with good oil-field practice, that the
   > well on the other tract was a dry hole and not from time
   > when drilling operations ceased on the other well, since more
   > than drilling is necessary to complete a well.

Construction of contracts, see 1 Restatement, Contracts, §§ 230,
235, 236.

Appeal from Kent; Hoffius (Cornelius), J. Submitted June 7, 1940. (Docket No. 63, Calendar No. 41,098.) Decided September 6, 1940.

Bill by Neil Howard and wife and Crown Development Company, a Michigan corporation, against J. P. Hughes and R. W. Fuller, doing business under the assumed name of Texagan Oil & Gas Company, to set aside a lease and for other relief. From decree rendered, plaintiff Crown Development Company appeals. Affirmed.

*Starr & Starr* (*James H. McLaughlin*, of counsel) and *Steketee & Steketee*, for plaintiff Crown Development Company.

*Seth R. Bidwell*, for defendants.

CHANDLER, J.  Plaintiffs Neil and Anna Howard are the owners of 12 acres of land in Walker township in Kent county. On May 25, 1939, they leased this land to defendant J. P. Hughes, doing business as the Texagan Oil & Gas Company, for a nominal sum under the commonly accepted form of oil and gas lease. The following clause was typed in the lease:

"This lease must have a well started within 30 days of the completion of the well now being drilled in section 31."

It is conceded that this provision referred to a well being drilled by the Voorhies Company, called the Powers well.

On July 15, 1939, the Howards gave a second oil and gas lease covering the same property to Harvey Vander Laan. This so-called "top" lease provided for commencement of operations within 90 days. Lessee Vander Laan knew of the former lease to

Hughes and in the lease he agreed to bear all expense of litigation in defense of any action commenced against the Howards because of the prior lease.

Vander Laan assigned his lease to plaintiff Crown Development Company on August 21, 1939, and this suit was started on August 23, 1939.

The parties to this action had no control over the progress of the Powers well. The date of its completion was used as an arbitrary standard from which a period of 30 days was to be measured within which the Howard well was to be commenced.

The contractors developing the Powers well ceased drilling about June 3d, and then the usual acid treatments were employed in an attempt to induce the oil to flow. Various treatments and pumping operations continued until about July 10th in an effort to make it a producing well. Finally, the contractor decided he had a dry hole and commenced plugging operations which were completed on July 24, 1939.

On July 19, 1939, there was filed with the conservation commission a notice of intention to abandon the Powers well. This notice states that it was completed on July 19, 1939, and that plugging operations were commenced. On August 9, 1939, the log of oil, gas or test well was filed. This must be filed, according to the rules of the commission, within 30 days after the "first completion" of the well. The log shows that the drilling on the Powers well was finished on June 3, 1939.

On July 10, 1939, a well on neighboring property called the Cummings well came in as a producer. This gave the Howard property more potential value as oil land.

Defendant Hughes applied to the conservation commission for a drilling permit for the Howard land on July 18th and on July 25th, and had a survey

made on the latter date. The permit to drill was issued July 26th and the drilling contractor moved his rig on the land on July 27th. Actual drilling began on August 5, 1939, and continued steadily after that.

On August 24, 1939, defendant Hughes was served with a summons in this case. At that time, the drilling had reached a depth of 625 feet and approximately $2,500 had been spent by the Texagan company in drilling the hole. The suit sought to restrain further operations by Hughes and the Texagan company and to cancel the lease given by the Howards to Hughes, representing the Texagan company..

After hearing the testimony of the parties and of the oil men and experts who were called by each side, the trial court found that the Howard well was commenced within 30 days after the completion of the Powers well, and entered a decree upholding the lease of the Texagan Oil & Gas Company, dismissing the bill of complaint, and dissolving the temporary injunction. The Crown Development Company takes a general appeal from that decree.

The primary question to be determined is: When was the Powers well "completed"?

Appellants contend that the Powers well was completed prior to June 7, 1939, when it was drilled in. Appellees contend that the well was not completed until it was determined by good oil-field practice whether it was a producing well or a dry hole.

There is a conflict in the testimony as to the intention of the parties in inserting the 30-day provision in the lease.

Mr. and Mrs. Howard testified that they wanted a well right away and that they understood that the term "completion of well" as used in the lease referring to the Powers well should mean "drilled in."

On the other hand,. Hughes testified that it was understood and agreed that the Texagan company would commence drilling on the Howard land within 30 days if the Powers well came in as a producer, but that if the Powers well was a dry hole he would have a year in which to commence drilling operations.

This claim was denied by the Howards, but in this connection we must note the clause in the lease which provided:

"It is agreed that this lease shall remain in force for a term of one year from this date, and as long thereafter as oil or gas or either of them is produced from said land by the lessee."

The provision tends to support the contention of Mr. Hughes.

It is also difficult to justify the Howards' position in insisting that they understood the Texagan company would commence within 30 days after the Powers well was "drilled in" because they wanted a "short-term lease" and wanted a well "right away" in view of the fact that the top lease given to Vander Laan and assigned to appellant provided for the drilling to start in 90 days. It would seem more consistent with their position if the Howards had insisted on immediate drilling by Vander Laan instead of allowing him about three months to start a well.

Upon reading and considering the testimony and examining the exhibits, we are constrained to uphold the trial judge in his finding that the parties intended that the word "completion" meant the finding either of a producing well or a dry hole on the Powers land and not merely "drilled in" as contended by appellant. As a whole the record indicates that the purpose of the clause was to have a well started on the Howard land within 30 days after it was

determined definitely that the Powers well was a commercial well or a dry hole. There would be no point in setting the completion of a well as a starting date if only the completion of the drilling was meant. Merely drilling a well will not disclose whether there was oil or not, and apparently the parties here wanted to know whether there was oil on the Powers land before starting a well on their own land. In *J. J. Fagan & Co.* v. *Burns,* 247 Mich. 674 (67 A. L. R. 522), it was said, concerning an oil and gas lease:

"The lease should be read not only according to its words, but in connection with the purpose of its clauses."

In some States the courts have given a technical construction to the word "completion" as used in an oil and gas lease. But this is generally applied to the situation where a lessee agrees to complete a well within a given time or pay a delay rental or forfeit his lease. In such cases, these courts have held that the well is completed when drilled into the oil-bearing sands. This construction of the word is used in order to avoid a forfeiture of the lease, according to the language of these decisions. Many cases of this type are cited by appellant to support its contention that the Powers well had been completed prior to June 7, 1939, since the contractor did no drilling after that date. To employ such a technical construction to the word "completed" in the instant case would in fact work a forfeiture of the lease, the result guarded against in the cases cited by appellant. It is a well-recognized rule that courts of equity do not favor forfeitures.

No case construing a similar clause in an oil and gas lease has been called to our attention, nor have we been able to find one in our research. It is a novel clause in that neither party had any control whatsoever over the well to be "completed." The

Powers well had been given a fair and reasonable test up to July 14, 1939, by the methods recognized as proper in the oil industry. According to the record, experts seemed to agree that good oil-field practice in this district requires several acid treatments after a well is drilled in order to determine whether the well is a producer or a dry hole. Such treatment was given the Powers well, but it was found to be a dry hole and plugged about July 24, 1939. A few days later, the Texagan company started operations on the Howard land.

For the purpose of construing the disputed clause in the lease, the trial court set forth several elements as a guide in determining when an oil well is completed. They are:

"(1) An oil well is completed when it has been drilled to the oil formation prevailing in that district and (2) such means have been employed to produce oil as are known to the industry in that community and (3) to the extent that a reasonably experienced driller would use and employ same in good-faith effort to make a well an oil producer of a nonproducer (a dry hole)."

We believe this to be a workable rule in view of the nature of the Michigan oil fields and the comparatively new methods of treating and acidizing wells in the limestone area.

Several text writers have discussed the matter of "completion" as related to an oil well. In 2 Summers, Oil and Gas (Perm. Ed.), p. 262, § 350, it is said:

"Where it is stipulated in the lease that the lessee, having commenced a well within the time limited therefor, shall drill to completion with due diligence, or it is expressly stated that the lessee shall complete a well within a certain time, or else pay delay rental or suffer forfeiture of his lease, the terms 'comple-

tion' or 'completed well' have been held to mean that the well must have been to such depth as to penetrate to the oil and gas sand in that community, or to such depth that the absence of oil or gas precluded the probability of finding it at a further depth. Obviously a well need not be a producing well to be completed. But merely drilling into the oil or gas sand is perhaps not sufficient. Such further acts must be done as will demonstrate whether the well is a producer or non-producer, and if a producer, whether it is an oil or gas well."

This statement first indicates the rule in the forfeiture cases mentioned previously in this opinion which are not applicable in this case, but then goes on to say that mere drilling is not sufficient to constitute completion of a well.

In 40 C. J. p. 1069, § 1054, the rule is stated in different terms but to the same effect, indicating that more than drilling is required to complete a well.

"A completed well in this connection means a well finished or sunk to the depth necessary to find oil, or to such a depth, as, in the absence of oil, precludes a probability of finding it at a further depth. It ordinarily means a well drilled to the depth of the formation or sand in which oil in the particular district is usually and commonly found, whether found or not, and includes the 'clearing' of the well after such depth has been reached, so that the oil may flow by its own force or by pumping."

Other texts and cases also indicate that "drilling" and "completing" a well are not synonymous terms. See Morrison-DeSoto, Oil and Gas Rights (1st Ed.), p. 132; *Federal Betterment Co.* v. *Blaes,* 75 Kan. 69 (88 Pac. 555); *Uncle Sam Oil Co.* v. *Richards,* 76 Okla. 277 (184 Pac. 575).

In view of the foregoing discussion of the controlling question, there is no need to consider the other questions raised.

The decree is affirmed, with costs to defendants.

BUSHNELL, C. J., and SHARPE, NORTH, MCALLISTER, WIEST, and BUTZEL, JJ., concurred. The late Justice POTTER took no part in this decision.