**A. N. EDWARDS, Plaintiff in Error,**

v.

**Eula May HARDWICK, substitute plaintiff for Gertrude Carson, W. L. Potter, F. A Stewart, H. A. Williams, Julia May Smith, C. A. Kothe, C. T. Jennings, R. L. Carpenter, d/b/a Carpenter Well Servicing Co., and Independent-Eastern Torpedo Company, a corporation, Defendants in Error.**

**No. 37774.**

Supreme Court of Oklahoma.

Feb. 16, 1960.

496 

Gable, Gotwals & Hays, Tulsa, for plaintiff in error.

Verity & Muldavin, by Geo. L. Verity, Santa Fe, N. M., for defendants in error W. L. Potter and F. A. Stewart.

C. L. McArthur and Hobert G. Orton, Ada, for defendant in error Julia May Smith.

Vernon Roberts, Ada, for defendant in error C. T. Jennings, d/b/a Jennings Well Service.

Lynn Adams, Oklahoma City, for defendant in error Independent-Eastern Torpedo Co.

Busby, Stanfield, Deaton & West, Ada, for defendant in error Eula May Hardwick.

WILLIAMS, Vice Chief Justice.

The action in the trial court was originally filed by Gertrude Carson to cancel an oil and gas lease covering certain lands in Coal County. Judgment was rendered on plaintiff's petition cancelling the oil and gas lease. From this part of the judgment no appeal is prosecuted.

This appeal is from the judgment rendered on cross-petitions of two defendants holding plaintiff in error personally liable for unpaid bills for materials furnished and services performed on an oil well located on subject lease. Parties are referred to as in the trial court.

Defendants in the trial court were: W. A. Potter and F. A. Stewart, the lessees of said oil and gas lease; H. A. Williams, Julia May Smith, C. A. Kothe and plaintiff in error A. N. Edwards, assignees of fractional interests in said lease; and C. T. Jennings, R. L. Carpenter, d/b/a Carpenter Well Service Co. (in default) and Independent Eastern Torpedo Company, lien claimants.

Lessees, Potter and Stewart, assigned an (¼th) interest in the lease to defendant Williams, a drilling contractor. For this interest Williams agreed to move his rig on the lease and re-work the second of two holes previously drilled on the leased premises.

On February 3, 1953, defendants Potter, Stewart, Williams and Edwards (Plaintiff in error) entered into the following agreement:

"A. N. Edwards agrees to furnish a string of 4½" casing F.O.B. Tulsa and Okmulgee and loan a string of tubing for an undivided one-fourth (¼) interest of seven eighths (⅞) in the * * leasehold lands in Coal County, Oklahoma.

"F. A. Stewart, H. A. Williams, and W. L. Potter agree to complete the well free of any cost to A. N. Edwards, if the well is completed as a commercial well, then all parties pay their part of the tanks, hook up, and A. N. Edwards is to be paid for his tubing at invoice price. If the well is not completed as a commercial well, the other interested parties shall pull the pipe and tubing free of any expense to A. N. Edwards and shall deliver it back to his yard in Okmulgee. Any pipe lost in pulling shall not be charged to the other partners."

Defendant in error Smith subsequently purchased an undivided ⅛th interest in the working interest of said lease from Williams out of his ¼th.

On February 22, 1953, the reworking of the abandoned well was finished and said well flowed some oil, and when the flow subsided, oil was produced by swabbing. The oil so produced was run into pits. All of the principal parties, Potter, Stewart, Williams and Edwards were present at the well on this date. Upon being informed that there was no money with which to purchase tanks to store this oil, Edwards authorized Williams to order tanks and whatever they needed, to be charged to him, "and such equipment would be put on the same basis as their contract."

Subsequent production as shown by the evidence was sporadic, a total of 659.7 barrels of oil being run from April, 1953, to March, 1955.

In July, August and September, 1953, plaintiff in error, Edwards, wrote letters requesting return of the equipment furnished for this well or payment therefor.

During September, 1953, and thereafter, Williams, who had been selected as "operator" of the well by Potter, Stewart and Smith, secured from defendants Jennings and Independent-Eastern Torpedo Company further supplies and services in attempting to increase the production. Liens are being asserted by cross-petition for

such services. These lien claimants sought personal judgments against Edwards on the basis of his alleged personal liability as a partner in a mining partnership, and judgment foreclosing liens on personal property.

The trial court found that plaintiff had sustained her allegations and cancelled the oil and gas lease involved; found that a commercial well had been completed; and that the defendants Potter, Stewart, Williams, Edwards and Smith had entered into a mining partnership for the operation of a well on the leased premises; and that Edwards was estopped to deny that a commercial well had been completed, and awarded defendants Jennings and Independent-Eastern Torpedo Company personal judgments against the partners on the cross-petitions for the amounts due for services and materials, and ordered liens foreclosed.

Plaintiff in error Edwards is the only party appealing from the judgment of the trial court. He presents three assignments of error: (1) A commercial well was not completed; (2) Plaintiff in error is not estopped to deny that a commercial well was completed; and (3) If plaintiff in error's casing and tubing are subject to liens of lien claimants, he is entitled to judgment against those parties liable for the bills due to such lien claimants, for equipment furnished under the contract.

As this appeal does not present for review the correctness of the trial court's judgment in so far as it cancels the oil and gas lease, such ruling of the trial court will not be disturbed.

Defendants in error contend that a commercial well was completed, that a mining partnership was created by Edwards, Potter, Stewart and Williams, and that by virtue of such partnership, Edwards is personally liable for all of the expenses incurred in the subsequent work on the well. Whether Edwards is personally liable to such lien claimants under the agreement set out above, is dependent upon whether the well was completed as a commercial well, and upon whether he became a partner in a mining partnership.

This agreement did not create a present partnership, if any at all, but was wholly executory and contingent upon the completion of this well as a commercial well. Ash v. Mickleson, 118 Okl. 163, 247 P. 680; Irelan v. Smoot, 132 Okl. 270, 270 P. 29. Nor does it specifically, by its terms, provide for the future operation of the well or further development of the lease so as to come within the rule stated in Young v. Krumme, 109 Okl. 145, 236 P. 606; Schraeder v. Gormley, 127 Okl. 65, 259 P. 869.

We have defined this term "completion" as used in oil and gas matters several times. In Twin States Oil Co. v. Westerly Oil Co., 93 Okl. 297, 220 P. 839, we defined the term "completion of well" as used in a drilling contract which provides for a limited period of time in which to operate and test a well after its completion. In this situation the term "completion of well" means (includes) the cleaning of the well after reaching the specified depth, so that the sand reached may give that flow of production, by its own force or pumping, which would result from a well so prepared in the ordinary and usual manner for making preparation for such test. See also Arnold v. Adams, 147 Okl. 57, 294 P. 142.

In Uncle Sam Oil Co. v. Richards, 76 Okl. 277, 184 P. 575, 576, in determining the date of completion of a well we said:

"* * * We think there is but one reasonable answer to the question thus presented, and that is, that the well was completed on the 28th day of November, 1912, when it was successfully shot and commenced to flow oil in large quantities * * *"

In Howard v. Hughes, 294 Mich. 533, 293 N.W. 740, 741, the court construed the term "completed oil well" when used in a lease requiring commencement of a well within a period of time after completion of a well being drilled by a stranger to the lease on other property.

As defined in the above cases, the term "completed well" has two meanings, de-

pending upon the instrument in which it is used.

■ When used in drilling contracts or drilling clauses the term "completion" means a well drilled to the specified sand or depth, and such well so prepared for use of the various methods of treatment to obtain production of oil and gas.

■ When used to determine the commencement of a period of time in which an act is to be performed or a right is to be exercised, as in Howard v. Hughes, supra, the word "completion" means a well drilled to the specified sand or depth, and such means known to the industry have been employed to produce oil "to the extent that a reasonably experienced driller would use" to make a producing well of a non-producing well.

■ There is also a third meaning of the word "completion" in relation to oil and gas wells. Where a well has been drilled and tested according to the directions of its owners (lessees), and necessary equipment and machinery is installed to maintain continuous production of oil or gas, for marketing purposes, the installation of such equipment and machinery is referred to as "completing the well", and expenses so incurred are called "completion costs", and a well so equipped is a "completed well". See Siemon v. Lyon, 51 Cal. App.2d 350, 124 P.2d 893 (which is based on a California statute).

In absence of specific agreement, the question of whether such equipping of a well is for the purpose of further testing of potential production, or for the purpose of permanent production is to be determined by the intention of the parties. The installation of tanks, pumps and other equipment is not necessarily determinative of the question of completion, as such equipment may be installed for the purpose of testing, previous to reaching a decision whether to complete or abandon the well.

Whether Williams, Smith, Potter and Stewart considered this well to be "completed", i. e., in such condition for continuous production for marketing purposes, or merely in a stage of further testing and re-working, cannot be ascertained from the evidence. More or less continuous effort was made to increase the production subsequent to the date the well first produced, February 22, 1953.

Edwards contends that he was not at the well-site except the one time; that the parties had no agreement as to whether the well should be operated as a producer; and that he did not take any part in the selection of Williams as operator of a producing well.

Even assuming that this well was completed on that date, as Williams testified, "you could call it completed then" (when the well started flowing), the contingency upon which the partnership depended, did not occur. That contingency was the completion of a commercial well.

■ The determination by a lessee that an oil well is a commercial well, one that is producing in paying quantities, is not conclusive, and when controverted, it becomes a question for judicial determination. Gallaspy v. Warner, Okl., 324 P.2d 848.

No evidence was introduced showing the actual potential production of this well. Nor was there a definite showing of the actual necessary expenses of producing such oil. The records of the Corporation Commission show the oil runs were as follows:

"April, 1953, 80.05 Barrels; August, 104.19 Barrels; September, 89.24 Barrels; and November, 66.87 Barrels; 1954: February, 70.12 Barrels; April, 63.12 Barrels; August, 57.63 Barrels; October, 63.24 Barrels; 1955: January, 63.24 Barrels."

In the intervening months not mentioned, none was reported.

The income to the working interest from the sale of the oil produced was $1,431.44. The expense in lifting this oil was not separately stated, but was included in statements covering both operating expenses, capital expenditures for equipment and reworking costs. The expenses allocable

solely to the cost of producing this income were:

Pumpers Feb. 1953 to March 1955
@ $35.00 month, $846.56
Williams operating expenses, telephone calls, etc. 300.00
Electricity, 256.00
Repairs on pump, motor 188.57
 ————
 Total $1591.13

These expenses do not cover supervision time, use of trucks, bookkeeping and insurance or amortization of capital expenditure for the equipment. It is obvious that there was no profit to the working interest on the oil produced by this well. We believe this conclusion to be borne out by the fact that not one of the owners saw fit to appeal from the judgment cancelling their lease.

It is true, as contended by defendants in error, that the determination of whether the production is in "paying quantities" is not to be determined over the life of the well. In this case, under the evidence presented, that is the only method possible. No evidence was introduced showing, at any specific time, that this was a commercial well, capable of producing oil in paying quantities. The only evidence as to production was that there was initial flow, and that the well would produce every day. No statement as to the quantity of such production was given. A witness for one of the lien claimants testified that after reworking in September, 1953, the well produced 7½ barrels per day for two days. However, this potential was obtained subsequent to the services of these lien claimants.

■ The completion of a commercial well, being the condition upon which the partnership, if any, was to be created, never having occurred, we hold that no partnership, if any were as a matter of law implied, came into existence.

Defendants in error cite Wells v. Shriver, 81 Okl. 108, 197 P. 460, 461, we said, in the tenth paragraph of the syllabus:

"The testimony in this case disclosed that a partnership was created by Wells, Shriver, and Bumbaugh for a joint venture in procuring and operating oil and gas leases on two 40-acre tracts of land. In consideration of Wells being let in to the partnership, he agreed to furnish the money and hold the title in trust as a part of his security."

In Wells v. Shriver, supra, the partnership was implied from the agreement of the parties. In addition, Wells was at the leases part of the time during their drilling operations.

In Billingsley v. Parmenter, 181 Okl. 315, 73 P.2d 869, 871, we said:

"It is contended by Holland and the other lien claimants that the alleged agreement to substitute the one-third interest in the well and lease for the 40-acre offset made Billingsley a partner with the original partners, Parmenter and Freeman in the development. Wells v. Shriver, 81 Okl. 108, 197 P. 460, 461.

* * * * * *

"This contract as allegedly modified by a subsequent oral agreement, provided that Billingsley should have a one-third interest in the lease and the well in question. That was the extent of the contract. There was no other evidence from which to draw the conclusion that Billingsley was a mining partner or joint adventurer. He assumed no part in the management of the venture and had nothing to do with the operations; purchased none of the material and employed none of the labor. His contract as allegedly modified could have created no more than a cotenancy between him and Parmenter and Freeman. Parmenter and Freeman merely agreed to give him an interest in the well and lease for a specified sum."

■ Each case of mining partnership must be determined by its own facts, but three requirements must always be present: (1), joint interest in the property by the parties sought to be held as partners, (2),

agreement, express or implied, to share in the profits and losses of the venture, and (3), actions and conduct showing co-operation in the project. White v. A. C. Houston Lumber Co., 179 Okl. 89, 64 P.2d 908; Anderson v. Keystone Supply Co., 93 Okl. 224, 220 P. 605; McAnally v. Cochran, 170 Okl. 368, 46 P.2d 955; Southard v. Oil Equipment Corp., Okl., 296 P.2d 780.

"Co-operate", as defined in Webster's New International Dictionary, means "to act or operate jointly with another or others." "Operate" is defined as "to perform a work or labor, to exert power or influence, to act, to work, to produce an effect."

■ A mining partnership status is created, when the conditions of joint interest in the property and an agreement to share profits and losses are extant, by the actions of the party sought to be charged with such relationship in actively joining in the promotion, conduct or management of the joint venture.

■ In the present case, there was no such action or conduct on the part of Edwards. His only contribution to this enterprise was the use of his casing and tanks according to the terms of the agreement.

We conclude that the determination of a mining partnership by the trial court is contrary to the weight of the evidence.

■ Defendants in error contend that Edwards is estopped to deny the existence of the partnership and to deny that a commercial well was completed by his acts in furnishing the tanks, well head and connections; by signing a division order; and by accepting and retaining his ¼th share of the proceeds from the oil produced.

Williams, on cross-examination, testified as to Edwards' furnishing the tanks:

"Q. Now in connection with the matter of the Independent Tank Company, I will ask you exactly the way that came up. I will ask you if Mr. Edwards didn't ask you about the oil that was in the pit and suggested to you that it should be put in a tank? A. I think that's right.

"Q. And then you said you didn't have any tank, and he said if you need a tank or tanks, get them from the Independent Tank Company and that he would furnish that on the same basis he furnished the tubing under the contract? A. No, everyone was to pay his part of the tank and tubings.

"Q. But anyway it was to be furnished on the same basis of the tubing in your agreement with him? A. Yes, I think so."

Stewart and Edwards testified that this equipment was furnished on the same basis as the agreement. This agreement was that the equipment furnished, if a commercial well was completed, would be paid for, and if the well were not completed as a commercial well, the equipment would be returned to Edwards.

The division order recites that the parties therein named are owners of the specified interests in the oil produced and authorizes payment for oil taken in such proportions. There are no recitals to the effect that the well is a commercial well, or that the parties thereto are partners.

Edwards admitted that he received his proportionate share of the proceeds from the oil produced, about $350.00. Defendants argue that by retaining these benefits, Edwards is estopped to deny that a commercial well was completed. As consideration for the use of Edwards' tubing, Potter and Stewart assigned a ¼th interest in the lease to Edwards. By virtue of this assignment, Edwards was legally entitled to his proportionate share of all oil produced, whether produced before or after completion of the well. By acceptance of such proceeds, he did not stipulate that such were profitably produced nor that such oil was produced in commercial quantities.

In reviewing the record of this case we do not find that any representations were made by Edwards and relied upon by defendants in error. Witness for the lien claimants testified that the services ren-

dered were furnished upon the request of Williams, without any knowledge that Edwards owned an interest in the well. The judgment of the trial court in so far as it applies to the doctrine of equitable estoppel against Edwards is not sustained by the evidence.

 Defendants in error further contend that Edwards stood by, letting others take all the risks, but claiming a share in the profits, and we should apply rule in Thompson v. Johnson-Kemnitz Drilling Co., 193 Okl. 507, 145 P.2d 422, 425:

> "Equity will not aid a party who, with full knowledge of the facts, and without risk to himself, stands by an unreasonable length of time and sees another assume all the risks in an uncertain venture in which said party might have shared, and, after success of the venture, seeks to share in the benefits thereof. That rule applies as between parties entitled to share in the production of oil."

The essence of the agreement involved herein was that in return for the use of his equipment, Edwards was to take no risks. If the well were a success, and completed on a profitable basis, then he would share in such profits. If it were not a success, his only loss would be the depreciation of his equipment, and a possible loss of a portion of the casing while pulling it.

The agreement involved herein under which Edwards furnished the equipment used on this lease was not filed for record until December, 1953, subsequent to the services rendered by the lien claimants. Under the provision of 60 O.S.1951 § 319, defendants in error C. T. Jennings, d/b/a Jennings Well Service and Independent-Eastern Torpedo Company have valid liens upon the equipment furnished by Edwards.

The judgment of the trial court is affirmed in so far as it pertains to said liens and is reversed in so far as it renders personal judgment against A. N. Edwards.

WELCH, HALLEY, JOHNSON, IRWIN and BERRY, JJ., concur.

DAVISON, C. J., and BLACKBIRD and JACKSON, JJ., dissent.

DAVISON, Chief Justice (dissenting).

I dissent to that part of the opinion finding that the well in question was not a commercial well. I am of the opinion that all of the evidence, when considered together, is sufficient to sustain the trial court's conclusion that a commercial well existed. Such finding was not against the clear weight of the evidence.

While it is true that the well was not a large producer, yet under the law it is not necessary that the whole operation be profitable for a well to be a commercial well. Henry v. Clay, Okl., 274 P.2d 545.

I am authorized to state that BLACKBIRD, J., concurs in this dissent.