Al GREER and Faye Greer, Husband and Wife, and Frank Yockey, Plaintiffs-Appellants,

v.

Harvey M. SALMON and Eva Salmon, Husband and Wife, and Evan C. Salmon and Avis D. Salmon, Husband and Wife, and Redfern & Herd, Inc., John J. Redfern, Pioneer Production Company, and all unknown claimants of interest in the premises adverse to the plaintiffs, Defendants-Appellees.

No. 9057.

Supreme Court of New Mexico.

Dec. 31, 1970.

Burr & Cooley, Farmington, for appellants.

Hinkle, Bondurant, Cox & Eaton, Roswell, for appellees.

## OPINION

McKENNA, Justice.

Plaintiffs brought this action in the District Court of San Juan County to quiet title to an oil and gas lease covering the SE¼ NW¼ of Section 30, T. 29N., R. 11W, N.M.P.M. The defendants answered alleging that the lease had terminated in accordance with its terms. Two of the defendants, Evan C. Salmon and his wife, who allege that they are the owners of the oil and gas mineral estate below the base of the Pictured Cliff formation counterclaimed under our § 65–2–4, N.M.S.A.1953, asking that the court direct the lease be released of record and that they recover $100.00 as damages, and attorney fees of not less than $500.00 plus costs.

The case was submitted on a stipulation of facts and affidavits. The district court decreed that the plaintiffs' First Amended Complaint be dismissed with prejudice and granted judgment to the defendants on their counterclaim for compensatory damages of $100.00 and reasonable attorney fees of $500.00 plus costs.

Appellants Greer contend that the lease to them did not automatically terminate by its terms and that the court should have quieted their title to the lease. The record does not reveal the trial court's reasoning for granting summary judgment to the appellees.

The forty-acre lease to the appellants was granted on September 1, 1950. Commercial gas production was obtained from the Pictured Cliff formation prior to the expiration of the five-year primary term.

Production continued intermittently through September 1956. From October 1956 until June 1960, except for 7 MCF produced in May 1958, no gas was produced into the pipeline of the purchaser, Southern Union Gas Company, as a result of a leak in the flow line between the well-head and the meter. The leak was discovered in May 1960, and production commenced June 1960 and continued thereafter. No drilling operations were conducted on the lease within a period of 90 days from September 1956. Although the well was capable of producing in commercial quantities, no gas was "sold or used" during the period from October 1956 through May 1960. Accordingly, no royalty was paid during those years to the lessors, nor was annual shut-in royalty paid to the lessors, as provided for in paragraph 3(b) of the lease. Since the resumption of production, the lessors received and accepted royalty payments on the production. In May 1957, the lessors had conveyed all minerals below the base of the Pictured Cliffs formation under the subject land to defendants Evan C. Salmon and his wife who in turn leased such minerals in September 1960 to some of the defendants. On May 9, 1960, Evan C. Salmon wrote to appellant-lessee Greer requesting a release of the September 1, 1950 lease, advising Greer that he had acquired the mineral rights below the Pictured Cliffs formation and that there had been no production for some time under the 1950 lease.

The habendum clause, paragraph 2 of the lease, reads:

"It is agreed that this lease shall remain in force for a term of five years from this date, said term being hereinafter called 'Primary Term,' and as long thereafter as oil and gas, or either of them, is produced or *producible* by the lessee from any well or wells existing on said land or any Pooled Unit hereunder." (Emphasis ours.)

At all times the Pictured Cliff well was "producible," that is, capable of producing

in commercial quantities. The appellants argue that no automatic termination could occur in view of the wording of the habendum clause and, further, that the shut-in royalty clause was a covenant, not a condition, and not subject to the automatic termination provision of the habendum clause. They argue also that there was no permanent cessation of production or abandonment as evidenced by certain actions taken in attempts to restore production in 1958, 1959 and 1960.

Numerous cases have stated that the primary purpose of an oil and gas lease is to obtain production from which the lessor will be paid a royalty. See, for example, the recent decision of Metz v. Doss, 114 Ill.App.2d 195, 252 N.E.2d 410, 412 (1969). While it is true that a lessor and a lessee frequently vary from standardized oil and gas lease forms, which makes hazardous the application of standardized interpretations, it is evident from paragraph 1 of the 1950 lease that there was no departure from the primary purpose of the usual oil and gas lease:

"That the said lessor * * * does grant, demise, lease and let unto the said lessee for the sole and only purpose and with the exclusive right of exploring, drilling, mining, operating for and producing oil and gas, or either of them, * * *."

The habendum clause, paragraph 2, supra, of this lease is unusual in the use of the phrase "produced or producible," but aside from this, it is a typical clause of limitation with a relatively short primary term and its "thereafter" provision designed for automatic termination. See Town of Tome Land Grant, Inc. v. Ringle Development Co., 56 N.M. 101, 240 P.2d 850 (1952); Terry v. Humphreys, 27 N.M. 564, 203 P. 539 (1922). Again, typically, at least as to purpose, the lease contains what has come to be known in the industry as "saving clauses"; paragraph 8 is a "cessation of production" provision and paragraph 3(b) contains a "shut-in royalty" clause for gas. Because the "cessation of production" and "shut-in royalty" clauses are designed to give the lessee some protection from automatic termination, logically, they are to be considered in conjunction with the habendum clause and in light of the primary purpose of the lease—the duration of the lessee's interest is to be viewed from the objective of the lease, to obtain paying production. 3 Williams Oil and Gas Law 36, 37, § 604; Town of Tome Land Grant, Inc., supra, 56 N.M. at 105, 240 P.2d at 852: "A lessee cannot be permitted to fail in development and hold the lease for speculative purposes unless in strict compliance with his contract for a valuable and sufficient consideration other than such development."

Paragraph 8, the "cessation of production" provision reads:

"It is specially agreed that in the event that oil or gas is being produced from said premises, or any Pooled Unit(s), after the expiration of the Primary Term hereof and said production shall *for any reason* cease or terminate, lessee shall *have the right* at any time within ninety (90) days from the cessation of such production to resume *drilling operations in an effort to obtain further production* under this lease, in which event this lease shall remain in force *so long as* such operations are continuously prosecuted, as defined in the preceding paragraph, and if they result in production of oil or gas, *so long thereafter* as oil or gas is being produced or producible from *any well existing on the premises, or any Pooled Unit*." (Emphasis ours.)

Here, production ceased after the expiration of the primary term and no drilling operations were conducted within the 90-day period from cessation.

It is apparent from the language that paragraph 8 was designed to fulfill the normal function of a cessation of production clause; to relieve the lessee from some of the harsh consequences of automatic termination by granting the lessee a period of 90 days to resume operations to

secure further production. It must also be noted that paragraph 8 grants the lessee a *right* to resume drilling operations as opposed to a *duty*, all of which militates against paragraph 8 being construed as a covenant rather than a condition affecting the term of the lease. The cases and commentators agree that such a provision must be construed as giving the lessee a set period of time within which to resume drilling operations in order to escape automatic termination of the lease. Woodson Oil Company v. Pruett, 281 S.W.2d 159 (Tex. Civ.App.1955); Hall v. McWilliams, 404 S.W.2d 606 (Tex.Civ.App.1966); Sunray DX Oil Co. v. Texaco, Inc., 417 S.W. 2d 424 (Tex.Civ.App.1967); Haby v. Stanolind Oil & Gas Co., 228 F.2d 298 (5th Cir. 1955); Berman, "Dry Hole, Drilling Operations, and 30 Day-60 Day Drilling Operations Clauses," 38 Tex.L.Rev. 270, 272 (1960); Hazlett, "Effect of Temporary Cessation of Production on Leases and Term Royalties," Southwestern Legal Foundation, Tenth Annual Institute on Oil and Gas Law and Taxation 201, 248–9 (1959).

In Woodson, supra, 281 S.W.2d at 164, it is said:

> "Appellants next contend that the cessation of production on the lease was sudden and only temporary, and that under such circumstances they were entitled to a reasonable time in which to remedy the defect and resume production. This might be true under the terms of some leases, but under the lease here the parties agreed and stipulated what would constitute temporary cessation. The lease provides, in effect, that if production should cease the lessee must commence re-working or additional operations within sixty days or the lease would terminate. If the cessation of production is for more than sixty consecutive days it is not to be regarded as temporary under the terms of this lease. If re-working or additional operations are not begun within the sixty-day period the lease terminates by its own provisions. * * *"

Hazlett, in his article, supra, states, at *249*:

> "The courts have been unanimous in construing this clause as meaning that cessation of production for longer than the stipulated period cannot be considered 'temporary.' In effect, the provision is construed as giving the lessee a fixed period of time within which to resume production or commence additional drilling or reworking operations in order to avoid termination of the lease; the period of grace having been fixed by agreement of the parties, it cannot be extended by the courts, no matter what the circumstances or the cause of the cessation."

In our case, the failure to produce because of a leak in a flow line is literally within the meaning of the phrase in paragraph 8, "and said production shall *for any reason* cease or terminate" (emphasis ours). Furthermore, "production" must be equated with producing and paying a royalty. Francis v. Pritchett, 278 S.W.2d 288 (Tex.Civ.App.1955); Cowden v. General Crude Oil Co., 217 S.W.2d 109 (Tex.Civ. App.1948); Kies v. Williams, 190 Ky. 596, 228 S.W. 40 (1921). "'Production' means that minerals have been 'produced, saved and sold' or 'produced, saved and consumed.'" 3 Williams, supra, § 616.1, 283.

Accordingly, we cannot agree with the appellants' argument that the lease could not have expired because there was no permanent cessation of production, or abandonment by the lessee, or lack of good faith in attempting to restore production. The fact remains that no operations were performed within the fixed 90-day period, and the cessation of production beyond the fixed period cannot be considered as only a temporary one.

The appellants argue that the failure to perform under paragraph 8 did not trigger

automatic termination because the lease was continued beyond its primary term, and beyond the 90-day cessation period, by virtue of a producible gas well on the premises, pointing to the habendum clause, paragraph 2, supra, which states, "and as long thereafter as oil and gas, or either of them, is produced or producible by the lessee from any well. * * *"

Paragraph 3(b), which contains the shut-in royalty clause for gas, states:

*"To pay to lessor, as royalty for gas from each well where gas only is found,* while such gas is being sold or used off the leased premises, one-eighth (⅛th) of the market price at the well of the amount so sold or used, *and while not so sold or used, the sum of Fifty Dollars ($50.00) per annum for each such well, payable on or before the first day of January following, and while such royalty is so paid such well shall be held to be a producing well within the meaning of paragraph 2 above. * * *"* (Emphasis ours.)

Historically, such a clause relates only to gas because a pipe line is necessary to market gas whereas oil can be marketed in many ways. Masterson, "Shut-in Royalty Clauses," 4 Rocky Mountain Mineral Law Institute 315, at 323 (1958).

As we have previously observed, a shut-in royalty clause is a saving clause associated with the habendum clause because its purpose is to grant a reasonable alternative to a lessee who is not able to produce gas, that is, market and pay the ⅛th royalty. It is a provision for substitute production or constructive production to arrive at a status of production as distinguished from actual production. Morriss v. First National Bank of Mission, 249 S. W.2d 269 (Tex.Civ.App.1952); Freeman v. Magnolia Petroleum Co., 141 Tex. 274, 171 S.W.2d 339 (1943). Normally, it differs from the royalty obligation of ⅛th, which is an express covenant, the non-payment of which does not trigger the automatic termination. Sperling, in his "Habendum Clause as Affected by Shut-in, Commence Drilling, Continued Drilling and Other Clauses," Southwestern Legal Foundation, Ninth Annual Institute on Oil and Gas Law and Taxation 1 (1958) at page 19, puts the distinction neatly:

"In other words, ordinarily the payment of royalty is not a condition, but an express covenant, non-payment of royalty, however long delayed, having no more effect upon the duration of the lease than a breach of the other duties or covenants contained in the lease provisions. The distinction must be that, in the absence of actual production, the *status of production* which has a profound effect, not only upon the duration of the lease, but upon the relationship of the parties to the lease or those claiming under them or subject to their rights, *can only be created by the fact of payment.* Put another way, the fact of payment or the failure to make payment is as determinative of production or the lack of it as is the fact of actual flow of oil or gas from the property or any cessation thereof."

Bearing in mind the automatic termination provision of the lease, we note the rhetorical comment of the appellees, "If the mere existence of a well capable of producing gas will hold the lease under the habendum clause * * *, then clearly there is no necessity for this shut-in royalty clause." Our concern is what did the parties intend, because we cannot ignore the shut-in royalty clause. The appellants say that the shut-in royalty clause is a covenant, not a condition, containing a firm obligation to pay $50 per year, and the failure to pay the annual sum does not activate or trigger the automatic termination provision of the habendum clause but, rather, is governed by paragraph 15 of the lease. This paragraph requires notice by the lessor to the lessee of a breach of a duty, and if not cured, then a petition to the court for termination.

In Freeman, supra, the court, in determining whether a provision should be

regarded as a covenant or condition, observed in 171 S.W.2d at 342, that "* * * it remained a question of law, to be determined under the express terms of the lease applicable thereto, as to which of the undertakings of the parties to the lease are covenants and which are conditions." There is an established rule that an oil and gas lease is to be construed most strongly against the lessee. Kulp, Oil and Gas Rights 659, § 10.64. While this rule should be cautiously applied, construing this lease against the lessee is particularly reasonable and appropriate where the question is whether a lease is or is not in existence, and where, from October 1956 through May 1960, except for a small amount produced in May 1958, no gas was produced or royalty paid. Responsibility for not discovering and repairing the leak must be borne by the lessee. It was his duty to achieve the primary purpose of the lease, to explore, develop and produce. Town of Tome Land Grant, Inc., supra. Simons v. McDaniel, 154 Okl. 168, 7 P.2d 419 (1932), at 421, states:

"Frequently this court has construed oil and gas mining leases strictissimi juris as against the lessee and liberally in favor of lessor. But this has always been to the end of promoting development as contemplated by the parties. * * *"

Weighing what we have previously said, with an examination of the particular language *"while such royalty is so paid such well shall be held to be a producing well within the meaning of paragraph 2 above"* (emphasis ours), in context with the entire lease, we conclude that the shut-in royalty clause must be viewed as a condition rather than a covenant. There is no absolute obligation to pay the sum of $50.00, instead the payment is optional in the sense that if payment is made, the requirement of the habendum paragraph is satisfied. The clause here is remarkably similar to what was held to be a condition in Freeman, supra, 171 S.W.2d at 341:

"The answer is found in the language of paragraph 3(b), as follows: '3. The royalties to be paid by lessee are: * * * (b) on gas, * * * a royalty of $50.00 per year on each gas well from which gas only is produced while gas therefrom is not sold or used off the premises, and *while said royalty is so paid, said well shall be held to be a producing well under paragraph 2 hereof.'"* (Emphasis supplied.)

The phrase, "while such royalty is so paid" is a condition and has been so interpreted. See North Hampton School District v. North Hampton Congregational Soc., 97 N.H. 219, 84 A.2d 833 (1951); Berry v. J. C. Penney Co., 74 N.M. 484, 485, 394 P.2d 996 (1964). Our conclusion is consistent with our finding that paragraph 8, also a saving clause, is not a covenant.

The words "where gas only is found" and "not so sold or used" which appear in our clause must be read and are to be equated with "producible" which appears in the habendum paragraph. As we construe the habendum paragraph, it envisaged a producing well paying a royalty in order to prevent termination, but where gas was found and not sold or used, that is, where there was a producible *gas* well, that well would be treated as a producing well if the annual shut-in royalty was paid. This construction does not ignore the term "producible"; it accords the strength and importance that are due the "thereafter provision" of the habendum paragraph, and is in harmony with the primary purpose of the lease.

The appellants could have saved themselves from automatic termination by complying with paragraph 8. Not having done this, they could have saved themselves from automatic termination by paying the shut-in royalty for the producible gas well, but this was not done. Therefore, the lease did expire automatically at the end of January 1, 1957. Paragraph 15 of the lease governs the enforcement of the lessees' covenants and is not applicable

to the habendum clause and its associated saving clauses. See 4 Williams, supra, § 682.2, at 347, 348.

Finally, the appellants claim that the acceptance of royalties by the lessor since June 1960 constituted a confirmation of the validity of the lease. The weight of authority is that once a lease has automatically terminated, it cannot be revived. Woodson Oil Co. v. Pruett, supra, 281 S. W.2d 159 at 164; see Summers, The Law of Oil and Gas, 382, § 470, and cases cited, and Williams, supra, § 604.7, at 79.

As to the appellees' claim under § 65–2–4, N.M.S.A.1953, for additional attorney fees here, we have considered the request but none will be allowed.

The judgment is affirmed. It is so ordered.

TACKETT and SISK, JJ., concur.