118 Mich. App. 74 (1982)
324 N.W.2d 541
MICHIGAN WISCONSIN PIPELINE COMPANY
v.
MICHIGAN NATIONAL BANK
Docket Nos. 44872, 45942.
Michigan Court of Appeals.
Decided July 19, 1982.
Mika, Meyers, Beckett & Jones, for Michigan Wisconsin Pipeline Company.
Braun, Kendrick, Finkbeiner, Schafer & Murphy, for Michigan National Bank.
William B. Beier, for defendant landowners.
Before: M.J. KELLY, P.J., and BRONSON and R.M. DANIELS,[*] JJ.
BRONSON, J.
Appellants contest the Macomb County Circuit Court's affirmance of probate court decisions holding that the lessee's interests in certain oil and gas leases had expired, those interests reverting to the lessors. This Court granted leave to appeal to both appellants and consolidated the cases for purposes of hearing and disposition.
Appellees own land above the Muttonville natural gas field, in Macomb County. They executed oil and gas leases in favor of R.A. Wells in 1961. Wells retained a fractional overriding royalty interest and assigned the working lessee's interest to Michigan Consolidated Gas Company (hereinafter Consolidated). Wells later sold a share of his remaining interest to a buyer represented in this action by Michigan National Bank.
Beginning in 1966, Consolidated developed Muttonville as a natural gas field. It drilled 7 productive wells and 13 dry holes. Consolidated used the natural gas it produced from the field in its public utility business. This arrangement continued into 1973, resulting in substantial royalty payments to defendant lessors. On November 1, 1973, plaintiff, Michigan Wisconsin Pipeline, contracted with Consolidated to purchase Consolidated's various interests in the field, including all of its interests as *79 lessee under the oil and gas leases executed by appellees. This sale was closed on October 30, 1975.
Plaintiff is an interstate gas transmission company. In 1973, plaintiff became interested in using the Muttonville field for the storage of natural gas. To use the field for storage, gas is injected underground and withdrawn when needed. In 1973, 15% of the original gas reserves (approximately 1.6 billion cubic feet) remained in the field. Plaintiff planned to use this gas as "cushion gas". Subsequently, stored gas could thereby be more efficiently withdrawn from underground storage.
Plaintiff failed in its efforts to buy all of the outstanding interests in the field. In December of 1973, plaintiff applied to the Michigan Public Service Commission for a certificate of necessity, a requirement precedent to the filing of a condemnation action. Plaintiff was empowered to condemn property for use as a natural gas storage facility by MCL 486.252; MSA 22.1672. Commission hearings were completed in March, 1974, and the commission issued its certificate of necessity on September 9, 1974. On September 17, 1974, plaintiff filed its condemnation petition in probate court. In the action, plaintiff sought to acquire, among other things, the royalty interests of defendants which were subject to the oil and gas leases owned by Consolidated. After the condemnation petition was filed, the probate court separated the proofs on necessity and damages. Three commissioners were appointed to hear the trial on necessity. The commissioners found necessity in their report filed January 23, 1975. This finding was confirmed by the probate court, which granted plaintiff possession of the condemned interests on March 12, 1975. Consolidated continued as operator *80 of the field until October 30, 1975, the date of closing of its sale agreement with plaintiff.
Meanwhile, in March of 1974, Consolidated severely cut back on production from the Muttonville field. From that point on, Consolidated limited its production of natural gas from the field to an amount sufficient to operate heaters at its Columbus compressor station in St. Clair County and to provide appellees with "free gas" for domestic use in their dwellings, as required by the terms of the oil and gas leases.
On October 26, 1976, during the preliminary stages of the damages phase of the condemnation action, appellees sought to challenge the validity of the oil and gas leases. Over plaintiff's objection, the probate court allowed them to amend and supplement their pleadings to assert that the oil and gas leases covering their property had automatically terminated prior to plaintiff's being granted possession on March 12, 1975. The probate judge agreed and held that the leases automatically expired due to lack of production by the lessee. This holding was affirmed in the circuit court.[1]
Although appellants raise many issues, this appeal essentially turns on the construction of the oil and gas leases covering the Muttonville field. Since we agree with appellants that the lower courts incorrectly construed the leases, we address only those claims going to the proper construction of these lease agreements.
In construing an oil and gas lease, this Court is guided by the Supreme Court's decision in J J *81 Fagan & Co v Burns, 247 Mich 674; 226 NW 653; 67 ALR 522 (1929). In J J Fagan, the Court noted the widespread use of standard oil and gas lease forms. The Court further noted that the language used in those lease forms had evolved through the process of trial and error with careful attention being paid to judicial decisions interpreting the standard contractual verbiage. An oil and gas lease is not an isolated agreement drafted by uninformed neighbors to express roughly their agreement but, rather, is a technical contract reflecting the development and present status of the law of oil and gas. Id., 678. Such a lease, the Court concluded, should be read "not only according to its words, but in connection with the purpose of its clauses". Id., 678. See, also, Howard v Hughes, 294 Mich 533; 293 NW 740 (1940).
The following paragraph governs the terms of the oil and gas leases found to have expired in the present case:
"It is agreed that this lease shall remain in force for a primary term of ten years from this date and if lessee shall commence to drill within said primary term or any extension thereof, the said lessee shall have the right to continue drilling to completion with reasonable diligence and said term shall extend as long thereafter as oil and gas; or either of them, is produced by lessee from said land or from a communitized unit as hereinafter provided." (Emphasis added.)
The underlined passage is commonly called the habendum clause. The most significant matters raised by appellants on appeal concern the interpretation of this clause.
Appellants assert that production continued for purposes of the habendum clause because Consolidated *82 acted as a reasonable and prudent operator in deciding to cut back its marketing of gas from the Muttonville field in the face of the impending condemnation action. The word "production" in the habendum clause would literally be satisfied by the production of any oil or gas. Despite the usual meaning of the word, courts have construed the term "production" to be limited to production in paying quantities to the lessee. Superior Oil Co v Devon Corp, 458 F Supp 1063 (D Neb, 1978), rev'd on other grounds 604 F2d 1063 (CA 8, 1979), 3 Williams, Oil and Gas Law, § 604.5, p 57; Hemingway, The Law of Oil and Gas, § 6.4, pp 255-262.
The reasonable and prudent operator standard recognizes that interruptions in production may have causes other than the operator's desire to hold the lease for its speculative value, Robinson v Gordon Oil Co, 258 Mich 643, 648; 242 NW 795 (1932), 1 Brown, Law of Oil and Gas Leases (2d ed), § 5.02, pp 5-4 to 5-7. In some cases, interruptions in production may benefit both the operator and the lessors.
The Texas Supreme Court listed some of the matters to be considered in determining whether an operator meets the reasonable and prudent standard in Clifton v Koontz, 160 Tex 82, 89; 325 SW2d 684 (1959):
"In determining paying quantities, * * * the trial court necessarily must take into consideration all matters which would influence a reasonable and prudent operator. Some of the factors are: The depletion of the reservoir and the price for which the lessee is able to sell his product, the relative profitableness of other wells in the area, the operating and marketing costs of the lease, his net profit, the lease provisions, a reasonable period of time under the circumstances, and whether or not the lessee is holding the lease merely for speculative purposes." *83 In determining if an operator acts in a reasonable and prudent manner, a court must give deference to his judgment on decisions concerning the appropriate development of a field. Amoco Production Co v Ware, 269 Ark 313; 602 SW2d 620 (1980). Courts must consider whether an operator shows good faith in continuing to develop a property for the purpose of making a profit and is not merely holding the lease for speculation. Robinson, supra, 648, 1 Brown, Law of Oil and Gas Leases (2d ed), § 5.02, pp 5-7. The expectations of the parties to the lease are fulfilled when the operator does what would reasonably be expected of operators of ordinary prudence acting with regard to the interests of both the lessor and the lessee. Robinson, supra, 649. To terminate an oil and gas lease, it is necessary for the lessor to establish two propositions: first, that the operator/lessee was not making a profit from the operation of the field; second, that a reasonably prudent operator would not have continued to operate the field under similar circumstances. Bales v Delhi-Taylor Oil Corp, 362 SW2d 388 (Tex Civ App, 1962).
The probate judge rejected the claim that Consolidated acted as a reasonably prudent operator in drastically reducing production. He held that efforts to develop a gas storage reservoir did not further the objects of a lease for the production of gas. This holding was a misinterpretation of the reasonable and prudent operator standard. Given the facts of this case, the reasonable and prudent standard must be applied to the actions of Consolidated as operator/lessee. The corporate connection between Consolidated and plaintiff Michigan Wisconsin Pipeline Company must be ignored in deciding if Consolidated's actions as operator were intended to benefit itself and the lessors. The condemnor's *84 interest and that of the operator might be adverse. We note the trial judge's finding that the condemnation was planned well before Consolidated stopped marketing gas from the Muttonville field.
The purpose of the habendum clause is to allow an operator to hold a lease after the primary term, though not for merely speculative purposes. The clause has been interpreted to force the operator to take reasonable measures to see that royalties are returned to the lessor. 3 Williams, Oil and Gas Law, § 604, p 36. Although the purpose of the term clause is normally served by severing gas from the land and transporting it to market, appellants argue the purpose is equally served by a plan in which the gas is marketed in place.
It is important to remember that Consolidated was not attempting to sell its lease rights to another operator who might develop the field further but was anticipating the transfer of all rights in the natural gas. At the time plaintiff sought a certificate of necessity from the Public Service Commission as a prerequisite to its filing of the condemnation act, Consolidated had a right to remove the gas remaining in the field and market it. The lessors have not claimed that had the gas been marketed at that time they would have received more than they would receive from a condemnation award. Given the legal standard governing condemnation awards, such a claim would almost certainly fail.
We agree with appellants' claim that a reasonable and prudent operator, faced with the impending condemnation action, would have ceased marketing and waited for the condemnation award. The "production" required to market the gas wisely and profitably to both the lessors and the *85 lessee was achieved by leaving it in place. So long as the condemnation proceedings were promptly pursued and were likely to succeed, no reasonable operator would have attempted to withdraw the gas and market it. For, to withdraw and market the remaining gas would have defeated the utility of the Muttonville field as a storage operation if plaintiff succeeded with the condemnation. Here, the sale of the field for purposes of storage appeared to represent the optimum form of development for both the holders of lessee and lessor interests. It is important to emphasize that while normally leaving gas in place does not promote its production or marketing, in the present case, the gas "in place" constituted its most marketable and productive form. Thus, the decision not to produce the gas in the Muttonville field by severing it from the ground but rather to "produce" it by leaving it in its more valuable state served the interests of all who had interests in the field.
Oil and gas leases are construed to promote production and development. Courts should avoid interpreting lease provisions in a manner which promotes waste of valuable energy resources. In the present case, the interests of Consolidated were best served by marketing the remaining gas in place to the condemnor. If cessation of production is held to terminate a lease under these circumstances, operators would be wise to withdraw the remaining gas if it has any value whatever. This gas must then be stored or sold. In this case, the lessors would not benefit substantially from this course of conduct and Consolidated, the operator, would incur significantly greater costs and therefore suffer detriment. Under the reasonable and prudent operator standard, the operator is expected to act in its own best interests, so long *86 as the interests of the lessors are not substantially impaired. The operator does not show bad faith by increasing its profits when the benefits the lessors receive are not reduced. The burden of proof is on the party claiming forfeiture of an oil and gas lease. Superior Oil Co v Devon Corp, 458 F Supp 1063, 1071 (D Neb, 1978), rev'd on other grounds 604 F2d 1063 (CA 8, 1979). It was not met by the lessors in the case at bar.
At the trial level, the lessors remain free to argue that the apportionment of value between their interests in the gas in place and those of plaintiff as Consolidated's successor must reflect their legitimate expectations of royalties under the lease. The lessors did not present any evidence that their interests were impaired by the actions of Consolidated as lessee.
Where a lessee-operator does not abandon production and takes reasonable steps to market gas, resulting in substantial benefits to both it and the lessors, its conduct should be tested under the reasonable and prudent operator standard. Under the present circumstances, it appeared certain that the gas would be condemned at its fair market value without further delay caused by the actions of the lessee. To require the lessee to do more to hold its lease would encourage both waste of its efforts and waste of gas.
Judge DANIELS would hold that the reasonable and prudent operator standard does not apply to this case because of the failure of the lessee-operator to make payments under the shut-in royalties clause. We disagree primarily because a lessee-operator need only make payments under a shut-in royalty clause if production has ceased. However, by applying the reasonable and prudent operator standard, we find that the lessee-operator *87 continued "production" by wisely working to market the remaining gas in the field by leaving it in its most valuable state, to-wit: in place.
Were we to hold that production had ceased, but that this halt was temporary, Judge DANIELS' position that the failure to make payments under the leases' shut-in royalty clauses would be more persuasive. However, even here, if the temporary cessation be deemed "reasonable", authority exists for the proposition that no forfeiture of the lessee-operator's interests may be declared. Gard v Kaiser, 582 P2d 1311 (Okla, 1978).
Reversed and remanded. Costs to appellants.
M.J. KELLY, P.J., concurred.
R.M. DANIELS, J. (dissenting).
I must dissent.
This appeal turns on the interpretation of the oil and gas leases covering the Muttonville field. In construing an oil and gas lease, this Court is guided by the Supreme Court's decision in J J Fagan & Co v Burns, 247 Mich 674; 226 NW 653; 67 ALR 522 (1929). The Court there noted the widespread use of standard oil and gas lease forms. The form's language had evolved through trial and error with careful attention being paid to judicial decisions interpreting it. An oil and gas lease is not an isolated agreement drafted by uninformed neighbors to roughly express their agreement, but is a technical contract reflecting the development and present status of the law of oil and gas. J J Fagan, supra, 678. Such a lease, the Court concluded, should be read "not only according to its words, but in connection with the purpose of its clauses". J J Fagan, supra, 678. See also Howard v Hughes, 294 Mich 533; 293 NW 740 (1940).
The following paragraph governs the terms of *88 the oil and gas leases found to have expired in the present case:
"It is agreed that this lease shall remain in force for a primary term of ten years from this date and if lessee shall commence to drill within said primary term or any extension thereof, the said lessee shall have the right to continue drilling to completion with reasonable diligence and said term shall extend as long thereafter as oil and gas, or either of them, is produced by lessee from said land or from a communitized unit as hereinafter provided." (Emphasis added.)
The underlined passage is commonly called the habendum clause. The major claims raised by plaintiff on appeal concern the interpretation of this clause.
Appellants claim that production continued, for purposes of the habendum clause, because Consolidated acted as a reasonable and prudent operator in deciding to cut back its marketing of gas from the Muttonville field in the face of the impending condemnation action. The word "produced" in the habendum clause would literally be satisfied by the production of any oil or gas. Despite the usual meaning of the word, courts have construed the term "production" to be limited to production in paying quantities to the lessee. Superior Oil Co v Devon Corp, 458 F Supp 1063 (D Neb, 1978), rev'd on other grounds 604 F2d 1063 (CA 8, 1979), 3 Williams, Oil and Gas Law, § 604.5, p 57.
The reasonable and prudent operator standard recognizes that interruptions in production may have causes other than the operator's desire to hold the lease for its speculative value. Robinson v Gordon Oil Co, 258 Mich 643, 648; 242 NW 795 *89 (1932), 1 Brown, Law of Oil and Gas Leases (2d ed), § 5.02, pp 5-4 to 5-7.
I do not agree that the reasonable and prudent operator standard applies here. In the present case, the lease contained a provision for the payment of shut-in royalties, stating:
"* * * Where such gas is not sold or used for a period of one year, lessee shall pay or tender as royalty an amount equal to the yearly delay rental as provided by the provisions of this lease, payable annually at the end of each year during which such gas is not sold or used, and while such royalty is so paid or tendered this lease shall be held as a producing property under the above paragraph setting forth the primary term hereof."
I would hold that the leases expired when the lessee failed to either market gas or pay the shut-in royalty. See Greer v Salmon, 82 NM 245; 479 P2d 294 (1970), but see Contra, Gard v Kaiser, 582 P2d 1311 (Okla, 1978). See also generally, 3 Williams, Oil and Gas Law, § 633.2, pp 460.2-460.4 and 4 Kuntz, Law of Oil and Gas, § 46.5, p 31.
I would affirm.
NOTES
[*] Circuit judge, sitting on the Court of Appeals by assignment.
[1] We note at this point that this is not a case in which all parties holding lessor interests are adverse to all parties holding lessee interests. Michigan National Bank, as trustee of a holder of a lessor interest, has joined the Michigan Wisconsin Pipeline Company as an appellant against the remaining holders of lessor interests.