**ANADARKO PETROLEUM CORPORATION,**
Appellant,

v.

Phillip **THOMPSON**, Individually and as Trustee of the Terry Thompson Children's Trust, Frances Diane Neal, Co–Trustee of the Terry Thompson, Jr. Trust for the Benefit of Margaret Thompson, Amarillo National Bank, Co–Trustee of the Terry Thompson, Jr. Trust for the Benefit of Margaret Thompson, Frances Diane Neal, Co-Trustee of the Terry Thompson, Jr. Trust for the Benefit of Frances Diane Neal, Amarillo National Bank, Co–Trustee of the Terry Thompson, Jr. Trust for the Benefit of Frances

Diane Neal, Troy Lee Thompson, Trustee of the Thompson Mineral Trust # 1, Sherae Melynn Thompson Bene, Trustee of the Thompson Mineral Trust # 1, David Sneed Thompson, Trustee of the Thompson Mineral Trust # 2, Kenneth Wayne Thompson, Trustee of the Thompson Mineral Trust # 2, Douglas N. Perkins, President of L.B. Brent, Inc., a Texas Corporation, Managing General Partner of L.B. Brent Properties, Ltd., Appellee.

No. 07–99–0147–CV.

Court of Appeals of Texas, Amarillo,

Dec. 20, 2000.

Rehearing Overruled Feb. 14, 2001.

37 appears top right.

to cessation of production and, alternatively, rejecting its defenses of revival, adverse possession, laches, and quasi-estoppel. We affirm.

### Background

In 1936, the predecessors in interest of Thompson entered into a gas lease with Texas Interstate Pipe Line Co. (TP). Through the lease, the lessors, among other things, "granted, leased, and let[ ], unto" TP "[a]ll of Section 63, Block 44, H & T C Ry Co. Survey ..." for "the purpose of mining and operating for and producing gas...." Of particular importance to this appeal are two clauses in the lease. The first states that it "shall remain in force for a term of one (1) year and as long thereafter as gas is or can be produced." The parties construe this provision to be the habendum clause, and we refer to it as such. The second clause states:

> "If, after the expiration of the primary term of this lease, production on the leased premises shall cease from any cause, this lease shall not terminate provided lessee resumes operations for drilling a well within sixty (60) days from such cessation, and this lease shall remain in force during the prosecution of such operations and if production results therefrom, then as long as production continues."

It is the interplay of these two provisions which gave rise to the current dispute.

Thompson read that portion of the habendum clause stating "can be produced" as requiring actual production in paying quantities. In other words, once the primary term ended, the lease could be maintained only by production in paying quantities. Furthermore, because actual

Sprouse, Smith & Rowley, P.C., Harlow Sprouse, Kirk Crutcher, Matt McCann, Amarillo, J. Kyle McClain, Houston, for Anadarko Petroleum Corporation.

Joe L. Lovell, Lovell, Lovell & Newsom, L.L.P., Amarillo, James R. Lovell, Lovell & Lyle, P.C., Dumas, for appellee.

Before BOYD, C.J., and QUINN and JOHNSON, JJ.

QUINN, Justice.

Anadarko Petroleum Corporation (Anadarko) appeals from a final judgment entered in favor of Thompson.[1] Through that judgment, the trial court, among other things, declared that a certain oil and gas lease (under which Anadarko was lessee) had terminated. Believing that the judgment should be reversed, Anadarko contends that the trial court erred in concluding that the lease had terminated due

1. Numerous parties were actually awarded judgment against Anadarko in the suit from which this appeal arose. They are named in the style of the cause. However, for the sake of brevity, we refer to them collectively as Thompson.

production of gas from the field stopped, at one time or another, for more than 60 days, the lease terminated, according to Thompson. Anadarko disagreed with the interpretation, however. It opted to read the habendum clause literally. That is, it read the phrase "can be produced" to mean capable of being produced, as opposed to actual production. And, since gas was always capable of being produced from the field, despite the brief interruptions in actual production, the lease never terminated. The foregoing dispute was brought to a head when Thompson sued Anadarko for a declaration that the lease had ended and for damages. Thompson subsequently moved for a partial summary judgment requesting the court to adopt its interpretation of the habendum clause, which the court eventually did. So too did it award damages, after trial on the merits, for gas allegedly converted by Anadarko once the lease had terminated.

### Issue One—Did the court err in entering partial summary judgment declaring that the lease terminated or, what does the habendum clause say?

Anadarko asserts that the trial court erred in granting the partial summary judgment "because the lease was capable of producing gas in paying quantities." That is, the habendum clause simply used the words "can be produced" when addressing the extension of the lease past its primary term. Those three words, according to Anadarko, should be construed literally. And, when one does so, they merely connote an ability to produce in paying quantities, not actual production. While a literal interpretation of the phrase would urge the adoption of Anadarko's stance, precedent reveals 1) that references to production in an habendum clause are seldom construed literally and 2) we must reject the construction proffered by Anadarko.

■ Years ago, in *Garcia v. King*, 139 Tex. 578, 164 S.W.2d 509 (1942), our Supreme Court stated that "to understand and properly interpret the language used by the parties [to an agreement] we must consider the objects and purposes intended to be accomplished by them in entering into the contract." *Id.* at 512. The agreement before it at the time was a mineral lease. The habendum clause contained therein read "this lease shall be for a term of 10 years . . . and as long thereafter as oil, gas and other minerals is produced from said land." *Id.* at 510. More importantly, the dispute between King and Garcia concerned whether "produced" simply meant any production or production in paying quantities. Obviously, the literal meaning of the word omitted the qualifier of "in paying quantities." So, in resolving the controversy, the objective of those entering into the agreement was perused. That objective, according to the court, consisted of the desire "to secure development of the property for the mutual [economic] benefit of the parties." *Id.* at 512. If the lease could not be operated at a profit then the parties could reap no benefits, the court continued. *Id.* at 512–13. Thus, to accomplish the objectives intended, the court interpreted "produced" to mean production in paying quantities, as opposed to just any production. *Id.; Gulf Oil Corp. v. Reid,* 161 Tex. 51, 337 S.W.2d 267, 269 (1960).

■ From *Garcia* we derive two rules applicable to our situation. The first we mentioned above pertains to the need to construe mineral leases in accordance with the objectives of the parties. Indeed, Anadarko itself acknowledged the propriety of this rule in its brief. There, it argued that the "language used by the original contracting parties should be given its plain

grammatical meaning *unless it definitely appears that the intention of the parties would thereby be defeated.*" (Emphasis added). The second rule compelled by *Garcia* involves the objectives or intent attributable to those entering such agreements. One of them is the intent to reap economic benefit from the development of the property. And, unless the agreement readily illustrates the purpose to be something else, we must construe the document and its words in a way fulfilling that purpose. *Garcia v. King, supra.*

At bar, we have the words of the original parties as well as the teachings of *Garcia* to aid us in divining the objectives *vis-a-vis* the lease before us. In paragraph one of the document, the lessors expressed that they leased the property to TP "for the purpose of mining and operating for and producing gas ..." among other things. This stated purpose mirrors that which the *Garcia* court found to be implicit in mineral leases, that is "to secure development of the property for the mutual [economic] benefit of the parties." *Id.* at 512. With this purpose in mind, we turn to Anadarko's contention to see if it would further the expressed and implied objectives of the original parties.

Again, Anadarko believes the phrase "can be produced" simply refers to the " 'physical ability' " or capability to produce gas in paying quantities. If this was a correct interpretation of the words, then one would immediately confront the problem of explaining how the aforementioned objective is furthered in situations where gas could be produced but is not. For instance, if Anadarko was correct, the lessee could conceivably forego all development of the field yet maintain the lease by merely establishing that gas could be produced in paying quantities if the lessee cared to produce gas. The outcome would be tantamount to that which the *Garcia*

court sought to avoid. That is, "[t]he lessors should not be required to suffer a continuation of the lease ... merely for speculation purposes on the part of the lessees." *Garcia v. King,* 164 S.W.2d at 513. So, the goal legally implicit and factually explicit in our lease would be thwarted if "can be produced" meant nothing more than the " 'physical ability' " to draw gas in paying quantities.

The adoption of Anadarko's construction would also render meaningless other paragraphs of the lease. For instance, paragraph 11, states that:

"[i]f, after the expiration of the primary term of this lease, production on the leased premises shall cease from any cause, this lease shall not terminate provided lessee resumes operations for drilling a well within sixty (60) days from such cessation, and this lease shall remain in force during the prosecution of such operations and if production results therefrom, then as long as production continues."

Why should there be any reason to mention the need to resume drilling operations and, thereby, pursue actual production to maintain the lease if the only thing that was required was the mere ability to produce? The answer is: there would not be. Thus, to hold that the ability to produce alone prolongs the lease would be to effectively erase paragraph 11 from the document.

■ So too would such a construction nullify paragraph 10 which states that:

*[n]otwithstanding anything in this lease contained to the contrary,* it is expressly agreed that if lessee shall commence drilling operations at any time while this lease is in force, this lease shall remain in force and its term shall continue so long as such operations are prosecuted and if production results therefrom, *then so long as production continues.*

(Emphasis added). As with paragraph 11, there would be no reason for the parties to allude in paragraph 10 to the maintenance of the lease through the continuation of drilling operations or production if the capability to produce was all that was needed. Yet, the rules of construction applicable to contracts and to the lease at issue obligate us to give meaning to every lease provision. *Heritage Resources, Inc. v. NationsBank,* 939 S.W.2d 118, 121 (Tex.1996). The stance urged by Anadarko violates that rule.

■ Given the foregoing, we cannot accept Anadarko's proposed construction of "can be produced." Instead, we adopt one that incorporates not only the ability to produce, but also the need for actual production in paying quantities. Our reasons for doing so are several. First, in reading the phrase to mean actual production in paying quantities, our interpretation furthers the objectives implicit (as per *Garcia*) and explicit in the lease. That is, the goal to reap economic gain is achieved.

Second, and as mentioned above, paragraph 10 provides that "notwithstanding anything . . . to the contrary" the lease remains viable as long as drilling operations continue "and if production results therefrom . . . production continues." In other words, the parties not only intended, but also expressed through paragraph 10, that the continuation of actual production was and is necessary to prolong the life of the lessee's interest.

Third, the interpretation finds support in opinions rendered by sister courts outside Texas. For instance, in *Greer v. Salmon,* 82 N.M. 245, 479 P.2d 294 (1970), the court had before it an habendum clause containing the words "and as long thereafter as oil and gas . . . is produced or *producible* by the lessee. . . ." *Id.* at 295 (emphasis in original). There, the lessee (like Anadarko here) argued that it need

only establish that minerals *could be* produced to maintain the lease. The New Mexico Supreme Court rejected the proposition, however. Instead, it held that the lessee was obligated to pay shut-in royalties. *Id.* at 298–99. This was so because the parties to the lease implicitly envisioned gaining economic benefit from the lease. That is, they "envisaged a producing well paying a royalty . . . to prevent termination." *Id.* at 299. And, the word "producible" had to be defined in accordance with that purpose. *Id.* So, it was not enough to merely show that minerals could be produced.

Moreover, in *Fisher v. Grace Petroleum Corp.,* 830 P.2d 1380 (Okl.Ct.App.1991), the court had before it an habendum clause virtually identical to that at bar. That is, it too stated that the lease remained operative "as long thereafter as oil, gas, . . . *is or can be produced* from said land." (Emphasis added). And, like Anadarko, the lessee suggested that the mere ability to produce was all that was needed to satisfy the clause. The Oklahoma court disagreed. In its view, the literal application of "can be produced" rendered superfluous the temporary cessation clause found in the lease. *Id.* at 1388. That is, there would have been no need for the lessee to resume drilling operations once actual production stopped (as mandated by the temporary cessation clause) if the ability to produce was all that was needed to prolong the lease. So, the court opted to heed the rules of construction applicable to contracts and avoid an interpretation of the habendum clause which negated the temporary cessation clause.

■ In sum, the proposition urged by Anadarko is untenable given binding authority and and the other terms of the lease. "[C]an be produced" means actual production unless the parties to the lease clearly indicate otherwise. The parties at

bar did not so indicate. Thus, we reject issue one and hold that the trial court was correct in granting partial summary judgment.[2]

### Issue Two—Did the court err in rejecting Anadarko's affirmative defenses after trial, or do the court's findings enjoy evidentiary support?

Next, Anadarko contends that the trial court erred in rejecting various of its affirmative defenses to the claim that the lease no longer existed. Although the corporation failed to expressly attack the judicial findings of fact upon which the court based its decision, we nevertheless treat its endeavor as one doing so. And, in so construing the argument, we hold that in order to prevail Anadarko must, at the very least, show that no evidence supported the trial court's determination. *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex.1983); *Natural Gas Pipeline Co. v. Pool*, 30 S.W.3d 639, 646, 2000 LEXIS 6903 at 21 (Tex.App.—Amarillo 2000, no pet. h.). With that said we now address each defense discussed by Anadarko on appeal.

#### 1. Adverse Possession

■ The first affirmative defense addressed is adverse possession. Anadarko contends that it so "acquired a 7/8ths interest in the gas" because twelve years had passed between the time the lease supposedly lapsed and the time it brought suit. We disagree.

■ One who has entered upon land in recognition of a title held by another must repudiate the relationship and claim title in himself before adverse possession can begin. *Killough v. Hinds*, 161 Tex. 178, 338 S.W.2d 707, 710–11 (1960); *Davis v. Lund*, 41 S.W.2d 57, 58 (Tex.Comm'n App. 1931, holding approved). Here, Anadarko

declared at trial that it never intended or desired to abandon the lease. In other words, it sought to act as if the lease was valid. This constitutes some evidence upon which the trial court could have concluded that the corporation 1) did not repudiate the contractual relationship between the parties to the lease and 2) thereafter claim title to the gas in a manner hostile to the lessors' ownership interests. That such evidence exists compels us to hold that Anadarko failed to show that no evidence supported the trial court's decision as it relates to adverse possession.

#### 2. Laches

■ Next, we address the affirmative defense of laches. Anadarko asserts that the doctrine applies because Thompson unreasonably delayed in attacking the validity of the lease. We disagree.

■ In seeking a declaration that the lease had ended, Thompson contended that the interest conveyed therein automatically reverted to the lessors upon cessation of production. *See Jupiter Oil Co. v. Snow*, 819 S.W.2d 466, 468 (Tex.1991) (holding this to be the rule in Texas). Therefore, the lessors were effectively protecting their claim of legal title to the land and to the minerals thereunder. And, given that they sought to protect their legal title, laches could not be invoked to defeat the claim. *Rogers v. Ricane Enterprises, Inc.*, 772 S.W.2d 76, 80 (Tex.1989) (holding that laches cannot be used to defeat legal title); *Natural Gas Pipeline Co. v. Pool*, 30 S.W.3d at 645–46, 2000 LEXIS 6902 at 10 (holding the same); *see* H. Williams, C. Meyers, P. Martin & B. Kramer, *Oil and Gas Law* § 604.7, p. 88.24(2) (1999) (stating that once a lease has automatically

---

**2.** Andarko does not argue that there was no cessation of production or temporary cessa-

tion of production, therefore, we do not address those issues.

terminated, any delay by the lessor in bringing suit is immaterial, and any claim of waiver is inapplicable).

 Furthermore, and assuming *arguendo* that laches could be invoked to defeat legal title, authority nonetheless holds that the defense is not triggered until the prospective complainant (*i.e.*, Thompson) received notice of the adverse claim. *Gaynier v. Ginsberg*, 715 S.W.2d 749, 756 (Tex.App.—Dallas 1986, writ ref'd. n.r.e.). At bar, however, there appears evidence indicating that Thompson did not know about the lease terminating until "late '96 or early '97." Furthermore, suit was filed on or about February 14, 1997, which was within two to three months after obtaining notice. Those circumstances constituted some evidence upon which the trial court could have held that Thompson did not unreasonably delay in prosecuting the claim. That such evidence exists compels us to hold that Anadarko failed to carry its burden on appeal as it relates to laches.

### 3. Quasi–Estoppel

 Next, we address the defense of quasi-estoppel. Anadarko contends that Thompson is estopped from disputing the validity of the lease because the lessees accepted benefits therefrom over many years. Yet, before the acceptance of benefits can trigger estoppel, it must be shown that the benefits were accepted with knowledge of all material facts. *Frazier v. Wynn*, 472 S.W.2d 750, 753 (Tex.1971). As mentioned above, there appears of record some evidence that Thompson did not know that the lease terminated until "late '96 or early '97." If Thompson did not know the lease had terminated until that time, then some evidence exists illustrating that the benefits were not accepted with knowledge of all material facts. And, that such evidence exists compels us to hold

that Anadarko failed to carry its burden on appeal as it relates to quasi-estoppel.

### 4. Revivor

The last defense we address is revivor. Anadarko contends that Thompson revived the lease through the execution of documents "specifically acknowledging and agreeing that the gas lease was … valid and subsisting…." We again disagree.

 Revivor consists of "the subsequent execution of a formal document even to a third person which expressly recognizes in clear language the validity of a lifeless deed or lease…." *Natural Gas Pipeline Co. v. Pool*, 30 S.W.3d at 646, 2000 LEXIS 6902 at 11; *Westbrook v. Atlantic Richfield Co.*, 502 S.W.2d 551, 555–56 (Tex.1973) (quoting *Hastings v. Pichinson*, 370 S.W.2d 1, 4 (Tex.Civ.App.—San Antonio 1963, no writ)); *Exploracion De La Estrella Soloataria Incorporacion v. Birdwell*, 858 S.W.2d 549, 554 (Tex. App.—Eastland 1993, no writ). Encompassed within this theory is the requirement that the document supposedly reviving the lease refers to the lease allegedly being revived. *Westbrook* mandated as much by noting that the cases which previously found revivor did so because of the presence of "an intent to refer to a particular lease" or an "express reference" to the former lease. *Westbrook v. Atlantic Richfield Co.*, 502 S.W.2d at 555, *citing Loeffler v. King*, 149 Tex. 626, 236 S.W.2d 772 (1951), *Greene v. White*, 137 Tex. 361, 153 S.W.2d 575 (1941), and *Grissom v. Anderson*, 125 Tex. 26, 79 S.W.2d 619 (1935). Furthermore, this reference can either be expressed in the document or necessarily inferred from it. *See Loeffler v. King*, 236 S.W.2d at 774 (stating it was "obvious to us from a construction of this instrument as a whole that the lease referred to therein was the lease executed by Loeffler and Rankin to Horwitz"). Yet, irrespective of whether it is expressed or

inferred, it must be clear that reference is being made to the lease.

■■■■ So too must the document clearly evince an intent to grant a new estate in land or to revive the old one. Bruce Kramer, *The Temporary Cessation Doctrine: A Practical Response to an Ideological Dilemma,* 43 Baylor L.Rev. 519, 543 (1991); H. Williams, C. Meyers, P. Martin & B. Kramer, *Oil and Gas Law* § 340.04, p. 256. Indeed, Williams and Meyers write that because revivor grants a new estate in land, the latter "should not be held to have been granted without a showing of intent to grant it." *Id.* Furthermore, "casual reference to the earlier ... lease ... cannot reasonably be said adequately to evidence such intent where reference to the earlier instrument is made" for some reason unrelated to an intent to reinvest the lessee with an estate. *Id.* According to Williams and Meyers, such unrelated reason could be the desire "to avoid possible liability on covenants." *Id.* Or, reference to the old lease could have resulted "from the chance use of a formal printed instrument in which the clause in question is included." *Id.* at 256–57. In either example, the requisite intent would not be established. With this said, we now analyze the point *viz-a-viz* the documents purportedly establishing revivor.

### a. Division Order

■■■ The first document cited to by Anadarko is a division order executed on June 2, 1993. Therein, the parties to the instrument stated:

> It is understood and agreed that the Products produced from the described land are being produced under the terms of a valid and subsisting oil and gas lease(s) which may be included in (but not limited to) a unit validly pooled or unitized by governmental authority, unit designation or declaration, or other agreements.

As can be seen, reference is expressly made to "a valid and subsisting ... lease(s)." Yet, absent from the proviso are words granting an estate. Moreover, the particular lease alluded to is unspecified. And, to the extent some lease is referenced, the reference is to an "oil and gas" lease while that before us is merely a gas lease. Also, only one lease is in dispute at bar, while the aforementioned clause alludes to a lease or leases. These indicia constitute some evidence that the words relied upon by Anadarko (*e.g.,* "valid and subsisting") were simply part of a printed form designed to be used generally. In effect, they illustrate little more than the example proffered by Williams and Meyers as illustrative of something other than an intent to grant a new estate in land.

■■■■ To the foregoing we add the observation that, at best, a question of fact existed regarding Anadarko's purported reliance, to its detriment, on the division order as reviving the lease. Detriment is required when the document cited as reviving another lacks an express grant. *Natural Gas Pipeline Co. v. Pool,* 30 S.W.3d at 646, 2000 LEXIS 6902 at 11; *Exploracion De La Estrella,* 858 S.W.2d at 554; *Bradley v. Avery* 746 S.W.2d 341, 344 (Tex.App.—Austin 1988, no writ). The division order before us contains no such words of grant. Therefore, Anadarko was required to prove that it relied upon the division order as reviving the lease. Yet, the record contains evidence indicating that its actions in maintaining the property were founded *not upon* the belief that the division orders somehow revived the lease *but upon the belief that the lease never terminated.*

It can reasonably be said that the record permitted the trial court to find an absence

of 1) a clear intent (on the part of Thompson) to grant a new estate to Anadarko or otherwise revive the lease and 2) detrimental reliance by Anadarko. And, because of that, we must conclude that Anadarko has failed to show that the trial court's decision that this document did not revive the lease lacked evidentiary support.

### b. Transfer or Payment Order

The next document mentioned by Anadarko is a "Transfer or Payment Order" executed in November of 1992. Contained therein is a provision stating "[a]ccounting and payment are to be made only for the products actually marketed and the parties recognize *the right of the lessee and the operator of the lands* to use the products for the purpose of drilling, producing, or developing the lands covered by such lease(s), and the portion of the products so utilized need not be accounted for or paid for." (Emphasis added). In giving Anadarko "the right to use 'products for the purpose of drilling, producing, or developing the lands covered by such lease,'" Thompson supposedly "recognize[d] [the lease's] validity in clear language."

Yet, the document, like the division order, is simply a printed form, as evinced by the generic allusion to "lease(s)," which dealt with matters other than the resurrection of a defunct lease. Furthermore, words of grant are missing from it. Given this, evidence of detrimental reliance, or the lack thereof, becomes pertinent. And, that evidence, as discussed above, depicts that the company acted based upon its belief that the lease never terminated as opposed to the belief that the "Transfer or Payment Order" revived the lease. So, there again exists some evidence supporting the trial court's decision to find that the document in question did not revive the lease.

### c. Royalty Deed

Next, Anadarko cites a royalty deed as establishing revivor. Relied upon is the language therein that the conveyance was " *'subject to* all prior, recorded reservations and conveyances of oil, gas, or other minerals, and *all valid, recorded oil, gas and other mineral leases.'* " (Emphasis in original). While the execution of a royalty deed was held in *Loeffler v. King,* 236 S.W.2d at 774, to illustrate revivor, the *Loeffler* document contained the statement that *"[i]t is distinctly understood and herein stipulated that said land is under an Oil and Gas lease* ... providing for a royalty...." *Id.* at 774 (emphasis added). The royalty deed before us lacks such terminology, nor does it mention the particular lease to which the deed is subject.

Moreover, a plain reading of the passage "subject to ... all valid, recorded oil, gas and other mineral leases" simply evinces that the parties recognized that the conveyance was subject to any valid lease *that may exist.* The concept of "may exist" does not equate with "does exist" and, consequently, the words fall short of not only stating that the parties agreed to revive the lease, but also of illustrating that they intended to revive it. Thus, some evidence again supports the trial court's decision *vis-a-vis* the royalty deed.

### d. Remaining Documents

The remaining documents allegedly proving revivor consist of an October 16, 1985 complaint and request for hearing filed with the Texas Railroad Commission, a refund agreement, and various correspondence or demand letters from counsel allegedly representing Thompson. As with the other documents, each concerns subjects other than revivor and fail to contain express words of grant to Anadarko. This, coupled with the contradictory evidence regarding detrimental reliance as

mentioned above, again provides some evidence supporting the court's decision. Thus, Anadarko failed to prove that the lease was revived.

We find no error in the trial court's partial summary judgment. Furthermore, its rejection of Anadarko's affirmative defenses also finds support in the evidence. Thus, we affirm the final judgment before us.